## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| C.A.L., *individually and on behalf of all others similarly situated*, <br><br> Plaintiff, <br><br> v. <br><br> CNY FERTILITY, PLLC, <br><br> Defendant. | Case No.: 5:26-CV-0328 (AJB/MJK) <br><br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

1.      Plaintiff C.A.L. at all times relevant herein, was a patient of CNY Fertility, PLLC ("CNY" or "Defendant"), and brings this class action against Defendant in her individual capacity and on behalf of all others similarly situated, and alleges, upon personal knowledge as to her own actions, her counsels' investigation, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

2.      CNY is a reproductive health provider specializing in IVF, IUI, egg freezing, sperm freezing, and other fertility treatments.

3.      Defendant is a HIPAA covered healthcare entity and thus its disclosure of health and medical communications is tightly regulated. The United States Department of Health and Human Services (HHS) has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) Privacy Rule, no health care provider can disclose a person's

**CLASS ACTION COMPLAINT**

personally identifiable protected health information to a third party without express written authorization.

4. Defendant owns and controls cnyfertility.com ("Defendant's Website" or the "Website"), which it encourages patients throughout the country to use for scheduling consults, applying to become egg donors, research various treatment types, search for locations, purchase treatments, and pay outstanding bills.

5. Included within Defendant's Website is a Patient Portal[1] as well as a Donor Portal[2] (collectively referred to as "User Portals"), which Defendant encourages its patients and donors to sign up for and use. The User Portals also allow Patients and Donors to conveniently book appointments and schedule visits, review their health records and test results, pay bills, communicate with service providers, and complete/upload medical forms virtually and remotely.

6. Plaintiff brings this class action lawsuit to address Defendant's unlawful practice of disclosing Plaintiff's and Class Members' confidential personally identifiable information ("PII"), protected health information ("PHI"), and confidential health communications ("CHC") (collectively referred to as "Private Information") to third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook"), Google, Inc. ("Google") TikTok ("TikTok" and X (formerly known as "Twitter"), without implied or expressed consent, through the use of tracking software that is embedded in Defendant's website. (Meta, Google, TikTok and X will be collectively referred to a "Unauthorized Third-Party Marketers").

---

[1] Defendant's Patient Portal takes patients to a third-party site at https://www.cnyfertilitycenters.com/Patientportal which is hosted by PracticeHwy.com, Inc.
[2] Defendant's Donor Portal takes donors to a third-party site at https://www.cnyfertilitycenters.com/donorportal which is hosted by PracticeHwy.com, Inc.

**CLASS ACTION COMPLAINT**

7.     Although Plaintiff is presently unaware of every type of pixel and tracking tool Defendant has implemented on its Website, the pre-suit investigation, including the review of the publicly available HAR source code files, revealed the presence of a collection of Meta, Google, TikTok and X tools deployed on various sensitive pages of its Website, including the Portal. As used herein, Tracking Tools includes the Meta Pixel, Google Analytics, the Google Tag Manager, and similar tools offered by Google in conjunction with its marketing products and other platforms (such as "DoubleClick" and "YouTube"), as well as TikTok and X.

8.     The Tracking Tools specific purpose is to provide website owners with the ability to acquire the raw web user data and to then transform it into a monetizable commodity, just as an oil company acquires crude oil to transform it into gasoline. The Tracking Tools are offered for "free" to companies like Defendant but require the website owner to share and disclosure the web users valuable behavioral web browsing data with the Unauthorized Third-Party Marketer.

9.     To be sure, "data is the new oil of the digital economy,"[3] and Meta has built its more-than $300 billion market capitalization on mining and using that 'digital' oil. Google, and other ad tech companies are similarly motivated, with Google's online advertising business generated 42.4% of global digital ad revenues in 2023.[4]

10.     With the intent to monetize the patient information flowing through its Website, Defendant installed Tracking Tools from the Unauthorized Third-Party Marketers onto its Website, which provided Defendant with valuable marketing tools to create more efficient and profitable marketing campaigns.

---

[3] Joris Toonders, *Data is the New Oil of the Digital Economy*, WIRED (July 16, 2014), https://www.wired.com/insights/2014/07/data-new-oil-digital-economy/, available at https://www.linkedin.com/pulse/20140716110251-7386607-data-is-the-new-oil-of-the-digital-economy/.
[4] *Global Digital Advertising Revenues – A Look at the Big Three*, VISIBLE ALPHA (May 17, 2023), https://visiblealpha.com/blog/global-digital-advertising-revenues-a-look-at-the-big-three-alphabet-googl-meta-platforms-meta-amazon-com-amzn/.

**CLASS ACTION COMPLAINT**

11. In implementing the Tracking Tools, however, Defendant deprived Plaintiff and Class Members of their privacy and property rights by: (1) surreptitiously tracking, recording, and aggregating Plaintiff's and Class Members' confidential communications and Private Information; (2) causing Plaintiff's and Class Member's communications to be disclosed and intercepted by Unauthorized Third-Party Marketers; (3) utilizing the Private Information for marketing purposes, and (4) converting and monetizing the Private Information through various marketing tactics, which upon and belief, included, audience building, retargeting, geo-location, and other invasive marketing tactics. At no point along the data monetization process did Defendant obtain proper express written consent from Plaintiff or Class Members for any of these tortious acts.

12. Indeed, by deploying a combination of Facebook, Google Ads, TikTok, and Twitter tracking on its fertility provider website, Defendant maximized the exposure of its patients' and prospective patients' reproductive health data to advertising ecosystems in order to gain the highest probability of converting new patients with the lowest cost per conversion of a new patient.

13. Plaintiff's and Class Members' browsing and behavioral data qualifies as PHI because the data (1) related to the past, present and future medical care of the patient and (2) the data was sent in combination with direct and indirect identifiers from which the Plaintiff and Class Members could be reasonably associated with the data.

14. Notably, the transmission of the Private Information was uniform for Plaintiff and the Class Members and included explicit references to: (1) specific fertility treatments and procedures; (2) desired medical treatment or therapies; (3) desired locations or facilities where treatment was sought; (4) searches and purchases for particular treatments; (5) contact requests; and (6) bill pay information.

15. At a minimum, the information CNY divulged to the Unauthorized Third Parties allowed the Unauthorized Third-Party Marketers to learn that specific individuals were patients or donors seeking or receiving treatment at CNY clinics and other medical centers. In and of itself,

this data reveals the fact that an individual is being treated for fertility or is a donor and has received or will receive fertility treatments in some capacity.

16.    Moreover, the Private Information collected and disclosed by Defendant's Tracking Tools is not anonymous. The Tracking Tools capture a number of user specific data that Google, Meta, Tick Tok and Twitter can use to identify the specific user through various cross referencing and algorithmic methods, including persistent user IDs (e.g., fbp, cid, auid, TikTok anonymous_id), and, upon information and belief, IP addresses and browser fingerprint data points.

17.    Google, for example, connects patient data from Defendant's Website to the individual patient's Google Account (cid) which is linked to his/her Google account and contains additional details about their identity. Google "stores users' logged-in identifier on non-Google websites … in its logs … Whenever a user logs-in on non-Google websites, whether in private browsing mode or non-private browsing mode, the same identifier is associated with the data Google collects from the user's browsing activities on that website. Google further logs all such data (private and non-private) within the same logs and uses these data for serving personalized ads."[5]

18.    Simply put, the health information disclosed through the Tracking Tools is personally identifiable health information and is the digital equivalent of disclosing a comprehensive patient list to Meta, Google, TikTok and X.  Indeed, the Unauthorized Third Parties

---

[5] *See Brown v. Google LLC*, Case No. 4:20-cv-3664-YGR, 2023 WL 5029899 (N.D. Cal. Aug. 7, 2023) (Order denying summary judgment and citing internal evidence from Google employees). Google also connects user data to IP addresses, IP addresses have been classified by the United States Department of Health and Human Services ("HHS") as personally identifying information. "Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates", HHS, available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Aug. 29, 2023) ("Such PHI may include, for example, an individual's IP address . . .").

**CLASS ACTION COMPLAINT**

each offer Tracking Tools free of charge,[6] but the price that Defendant paid was the intercepted patient data. Effectively, Defendant traded its patient list for access to the "free" marketing tools.

19.    To be sure, there are many analytics companies and marketing campaigns that are HIPAA compliant that would have prevented Defendant's tortious acts; but Defendant opted for known non-HIPAA compliant analytics and marketing tactics to take advantage of the free services and gain access to powerful analytics, audience building, and re-targeting tools.

20.    Indeed, the Office for Civil Rights at HHS has issued a Bulletin to highlight the obligations of HIPAA covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online Tracking Tools.[7] The Bulletin expressly provides (in bold type) that "**[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.**" In other words, HHS has expressly stated that CNY's implementation of Tracking Tools violates HIPAA Rules.

21.    The Federal Trade Commission (FTC) has also warned hospitals and other entities that "even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule."

22.    Plaintiff and Class Members used the Website to request and book medical appointments, search for a medical provider, research medical conditions and treatments, contact

---

[6] *Facebook Pixel: What It Is and Why You Need It*, SEO DIGITAL GROUP, https://seodigitalgroup.com/facebook-pixel/ (last visited Aug. 26, 2025).

[7] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEPT. OF HEALTH & HUMAN SERV. (rev. June 26, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

**CLASS ACTION COMPLAINT**

a physician, review and request healthcare records, request prescription refills, sign up for classes or support groups, and pay medical bills.

23.    Patients simply do not anticipate that their trusted healthcare and insurance provider will send and trade their Private Information to social media and marketing companies for future exploitation and targeted marketing.

24.    Similarly, CNY does not have a HIPAA-compliant Business Associate Agreement ("BAA") in place with any of the Unauthorized Third Parties to safeguard its patients Private Information, and these companies are publicly vocal that they will not enter into healthcare BAA agreements.

25.    In sum, through the use of Tracking Tools, Defendant intentionally transmitted Plaintiff's and Class Members' highly sensitive communications and Private Information to Unauthorized Third Parties, including communications that contained private and confidential health information;  and further, Defendant utilized marketing tools and tactics with the intent of monetizing the Plaintiff's and Class Members' highly sensitive communications and Private Information. Neither Plaintiff nor any Class Member signed a written authorization permitting CNY to disclose or use their Private Information for marketing purposes.

26.    As a direct and proximate result of CNY's conduct, Plaintiff and Class Members have suffered numerous harms and injuries, including invasion of privacy, breach of fiduciary duty, breach of confidentiality, loss of control of their Private Information, misappropriation of their Private Information, conversion of their Private Information, and the ongoing invasion of privacy  and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

**CLASS ACTION COMPLAINT**

27. Consequently, Plaintiff individually and on behalf of the putative Class, brings this class action for legal and equitable remedies to address and rectify the illegal and tortious conduct and actions described herein. Plaintiff and the putative Class have suffered and seek the following damages: compensatory, loss of benefit of the bargain, conversion (FMV value of the use of the data for marketing), statutory damages, and in the alternative, nominal. Plaintiff further seeks restitution, disgorgement of profits or cost savings obtained from the improper use of the Private Information. Finally, Plaintiff seeks injunctive relief to address the ongoing invasion of privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

28. Plaintiff brings causes of action for (1) breach of fiduciary duty/confidentiality; (2) violation of the Electronics Communication Privacy Act ("ECPA"), 18 U.S.C. § 2511(1) – unauthorized interception, use, and disclosure; (3) breach of implied contract; (4) unjust enrichment; (5) violation of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631, *et seq.*; (6) violation of the California Invasion of Privacy Act, Cal. Penal Code § 638.51(a); (7) violation of the California Confidentiality of Medical Information Act ("CMIA"), Cal. Civ. Code § 56, *et seq.*; (8) violation of California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*; (9) invasion of privacy under California Constitution; (10) negligence; and (11) violation of the New York Consumer Law for Deceptive Acts and Practices Gen. Bus. Law § 349.

**CLASS ACTION COMPLAINT**

**JURISDICTION AND VENUE**

29.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) (the Class Action Fairness Act) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and a member of the Class is a citizen of a different state than CNY. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under 18 U.S.C. § 2510, et seq. (the Electronic Communications Privacy Act).

30.     This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy under Article III of the United States Constitution.

31.     This Court has personal jurisdiction over Defendant because its principal place of business is in this District and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

32.     Venue is proper under 28 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District.

**THE PARTIES**

33.     Plaintiff C.A.L. is an adult citizen and resident of the State of California and is domiciled in Rancho Cucamonga where she intends to remain.

34.     CNY is a New York professional limited liability company with its headquarters and principal place of business in New York, at 195 Intrepid Lane, Syracuse, New York and it operates facilities in 24 states, including California. Defendant is a privately held company, and upon information and belief, has at least one member domiciled a state other than New York.

**CLASS ACTION COMPLAINT**

35.     CNY Fertility has assisted in the birth of over 20,000 babies over more than 20 years of operation. [8] The clinic has experienced rapid growth, performing over 7,300 IVF cycles in 2022 alone. CNY Fertility is one of the largest fertility providers.[9]

### COMMON FACTUAL ALLEGATIONS

**i.      Underlying Web Technology**

36.     To understand Defendant's unlawful data-sharing and illicit marketing practices, it is important first to understand basic web design and tracking tools.

37.     Devices (such as computers, tablets, or smart phones) accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

38.     Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

39.     Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- **Universal Resource Locator ("URL")**: a web address.

- **HTTP Request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL, GET Requests can also send

---

[8] FAMILY BUILDING GUIDE, CNY Fertility, available at https://www.cnyfertility.com/wp-content/uploads/2019/01/flipbook-1.pdf#:~:text=For%20over%2020%20years%20and%2020%2C000%20babies%2C,this%20most%20challenging%20emotional%2C%20physical%2C%20financial%20journey (last visited Feb. 26, 2026).

[9] Ron Shinkman, *CNY Fertility Triples IVF Cycles Since 2017 With no Investor Funding*, INSIDE REPRODUCTIVE HEALTH (Apr. 27, 2023), https://www.fertilitybridge.com/news-articles/cny-fertility-ivf-growth-no-funding#:~:text=The%20company%20has%20performed%20more%20than%207%2C300,one%2Dyear%20embryo%20storage%20for%20just%20over%20$10%2C000.

**CLASS ACTION COMPLAINT**

data to the host server embedded inside the URL, and can include cookies.

- **Cookies**: a small text file that can be used to store information on the client device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

- **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.[10]

40.     Every website is comprised of Markup and "Source code." Source code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code. Source code is essentially the back of the website, and the user does not see what happens in the source code.

41.     Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests that are invisibly executed in the background without notifying the person using the web browser. For example, the Tracking Tools in this case are snippets of code that Defendant embedded in its Source Code, thereby instructing the Website to send a second set of transmissions to Google's own web servers.

42.     By contrast, the Markup is the façade of the website, and it is the only part that website visitors actually see when they access a website.  As an example, a patient's HTTP Request seeks specific information from the Defendant's Website (e.g., "Find a Doctor" page), and the

---

[10] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

**CLASS ACTION COMPLAINT**

HTTP Response provides the requested information in the form of "Markup," forming the webpage's content and features.

43.     Similarly, when a patient or donor visits cnyfertility.com and selects the "Pay Bill" button, their web browser automatically sends an HTTP Request to Defendant's web server. Defendant's web server automatically returns an HTTP Response, which loads the Markup for that particular webpage, where the patients only see the Markup, not Defendant's Source Code or underlying HTTP Requests and Responses.

## A. Tracking Tools

44.     The Unauthorized Third-Party Marketers offer Tracking Tools as software that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user communications and activity on those platforms. The Tracking Tools are used to gather, identify, target, and market products and services to individuals.

45.     In general, Tracking Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, that webpage's URL and metadata, button clicks, etc. Advertisers, such as Defendant, can track other user actions and communications and can create their own tracking parameters by customizing the software on their website, and configuring advanced matching tools that gather more sensitive and identifiable data from such sensitive parts of the Website as form submission. Defendant is in exclusive control over what additional configurations were set to capture and share data over and beyond the standard settings – e.g., Meta advanced matching, which commonly implemented to improve targeted audience marketing.

46.     When a user accesses a webpage that is hosting Tracking Tools, the user's communications with the host webpage are instantaneously and surreptitiously duplicated and sent

**CLASS ACTION COMPLAINT**

to the third party, and that user's browsing information is then part of the marketing tactics. Here, for example, the Meta Pixel and Google Analytics tool on Defendant's Website causes the user's web browser to instantaneously duplicate the contents of the communication with the Website and send the duplicate from the user's browser directly to Meta and Google's servers.

47.    The Tracking Tools individually and collectively track and disclose to the Unauthorized Third-Party Marketers what a user communicates to Defendant on its website.[11]

48.    Notably, transmissions only occur on webpages that contain Tracking Tools.[12] Thus, Plaintiff's and Class Member's Private Information would not have been disclosed to the Unauthorized Third Parties but for Defendant's decisions to install the Tracking Tools on its Website.

49.    Here, the Tracking Tools follow the user across the Website documenting and disclosing the user's journey including the browsing activity on the homepage, bill-pay page, patient resources, contact page, fertility treatments overview, affording treatment, purchase page, and sperm freezing-all explicitly, fertility- related content.

50.    The Tracking Tools further capture and disclose full sensitive URL structures like /fertility treatments/, /sperm freezing/ and /purchase/, which are transmitted to all tracking platforms directly revealing interest in fertility treatment.

---

[11] Amrita Singh, *Comparing Google Analytics vs Facebook Pixel*, Boltic, https://www.boltic.io/blog/google-analytics-vs-facebook-pixel#:~:text=Google%20Analytics%20is%20a%20comprehensive,time%20on%20site%2C%20and%20conversions.&text=On%20the%20other%20hand%2C%20Facebook,user%20actions%20on%20your%20website. (last visited Jan. 26, 2024)

[12] Defendant's Google Analytics tool stores a client ID in a first-party cookie named _ga (also identified as a cid) to distinguish unique users and their sessions on your website. Analytics doesn't store the client ID when analytics storage            is            disabled            through            Consent            Mode." https://support.google.com/analytics/answer/11593727?hl=en#:~:text=Google%20Analytics%20 stores%20a%20client,is%20disabled%20through%20Consent%20Mode. (last visited Jan. 26, 2026).

**CLASS ACTION COMPLAINT**

51.     The Tracking Tools allow unauthorized third parties to intercept the contents of patients' communications, receive and view patients' Private Information, mine it for purposes unrelated to the provision of healthcare, and further monetize it to deliver targeted advertisements to specific individuals. Upon information and belief, the web user activity is monetized through building audience profiles and campaigns from the user's specific activity on the Website.  The digital marketing activity was likely deployed through the use of Meta Business Suite tools, and similar concepts on the other platforms to allow for retargeting of web users and building and targeting look-a-like audiences from that web user data.  At no time, did Defendant obtain expressed, or even implied, consent to utilize and monetize the user and their patients' Private Information for marketing purposes.

52.     In this case, Defendant deployed Tracking Tools, including the Meta Pixel and Google Analytics tool, to intercept, duplicate, and re-direct Plaintiff's and Class Members' Private Information to Meta and Google.

53.     Defendant's Source Code manipulates the patient's browser by secretly instructing it to duplicate the patient's communications (HTTP Requests) with Defendant and to send those communications to Meta and Google. These transmissions occur contemporaneously, invisibly, and without the patient's knowledge.

54.     Thus, without its patients' or donors' consent, Defendant has effectively used its source code to commandeer and "bug" or "tap" its patients' computing devices, allowing Meta and Google, and other third parties to listen in on all of their communications with Defendant and thereby intercept those communications, including Private Information.

55.     The Tracking Tools then allow Defendant to optimize the collection and aggregation of the patient web data to then deliver ads, measure cross-device conversions, create

**CLASS ACTION COMPLAINT**

custom audiences, and decrease advertising and marketing costs.

56.     Because these identifiers remain in the data flow, CNY Fertility's transmissions categorically fail the Safe Harbor method in §164.514(b)(2) and therefore remain protected PHI through the entire collections, disclosure, and marketing utilization process.

57.     As explained below, these unlawful transmissions and data misuses are initiated by Defendant's source code concurrent with communications made via certain webpages.

**B.     Defendant's Tracking Tools Disseminate Patient Information on Every Page of Its Website**

58.     Defendant utilized various Tracking Tools sitewide, including:

   a.  **Meta Pixel ID: 548088252351431** was capturing and disclosing a user's page views and navigation on every page of the Website sending to Meta (facebook.com/tr) full page URL and a persistent fbp browser ID and other identifiers allowing Meta to re-identify the user with the browsing activity.

   b.  **Google Analytics 4 (GA4); Property ID:G-0R6VVKJX09**; the tracking was present on all pages including page titles explicitly naming fertility treatments (e.g., "Fertility Treatments: IUI, IVF, Donor Eggs & Sperm, Surgeries and More" including page URLs, user engagement events, and page view event; the tracking included session IDS,  browser fingerprinting metrics, and other identifiers allowing Google  to re-identify the user with the browsing activity.

   c.  **Universal Analytics (UA): Property ID: UA-61123463-1** was capturing all pages with pageview events including full URLs and page titles; the tracking included client ID cid=2144719496.176390964, browser fingerprinting metrics, and other identifiers allowing Google to re-identify the user with the browsing activity

**CLASS ACTION COMPLAINT**

d. **Google Tag Manager (GTM): Container ID: GTM-5242H5K** was the central dispatcher for GA4, UA, Google Ads, and webform interactions tracking across the entire website. GTM may also have been dispatcher for other Tracking Tools.

e. **TikTok Pixel: Pixel ID: CLEBRIBC77U0K4UVNV30** covering all pages with key events as pageviews and engaged session events communicating full URL; persistent anonymous ID and other identifiers were communicated allowing TikTok to re-identify the user with the browsing activity.

f. **Twitter/ X Analytics: Transaction ID: onnrz** with tracking across all pages communicating and transmitting fully page URLs and page titles along with identifiers sufficient to re-identify a user.

59. In sum, when a user visited Defendant's Website, the Unauthorized Third-Party Marketing companies each received transmission of full URLs that contained specific fertility treatment information from which medical inferences could be easily drawn, for example:

a. fertility-treatments/ — reveals interest in IVF, IUI, donor eggs/sperm
b. /sperm-freezing/ — reveals interest in male fertility preservation
c. /purchase/ — reveals intent to purchase fertility treatments
d. /affording-treatment/ — reveals financial consideration of fertility care

60. GA4 and UA tools specifically transmitted highly sensitive page titles like "Fertility Treatments: IUI, IVF, Donor Eggs & Sperm, Surgeries and More" and "Purchase Fertility Treatments | CNY Fertility".

### i.  HOMEPAGE TRACKING LINKED TO RE-TARGETING

61. Some specific examples of the tracking illustrate the privacy violations. Starting with the main entry point for CNY Fertility Website at www.cnyfertility.com, visitors arrive here when searching for fertility services, evaluating treatment options, and beginning their reproductive health journey.

62. Upon navigation to the homepage, the following tracking occurs:

**CLASS ACTION COMPLAINT**

- **Facebook Pixel** – Sends PageView event to facebook.com/tr with the CNY Fertility homepage URL and persistent fbp=fb.1.1763909686648.9638065112
- **Google Analytics 4** – Sends user_engagement and page_view events with page title "CNY Fertility | Making Priceless Affordable®" and cid=2144719496.1763909648
- **Universal Analytics** – Sends pageview event with same client ID
- **Google Ads Remarketing** – Sends remarketing hit to googleads.g.doubleclick.net with auid=2053072442.1763909656
- **TikTok Pixel** – Sends Pageview and Engaged Session events with anonymous_id=01KARKAETNHF2NGX9XCYKF7GHB_.tt.1
- **Twitter/X Analytics** – Sends base code event with page title
- **Google Tag Manager** – Container GT-WKP7ZGW orchestrates all tags, with consent mode initially "denied" then immediately "granted"

63.     Although the homepage does not explicitly name a specific fertility condition, it establishes that the user has visited a reproductive health provider's website. All six advertising platforms receive the homepage URL along with persistent identifiers, allowing Defendant the ability to engage in long-term tracking of visitors who may already be patients or are evaluating fertility treatment options. In other words, the user activity is being tracked in order to then monetize the data by using it as the foundation for building retargeted marketing without consent.

64.     A sample of Google Ads remarketing as a specific result of CNY Fertility's use of Tracking Tools can be seen in the following code excerpt:

> https://googleads.g.doubleclick.net/pagead/viewthroughconversion/747191147/?.. .&url=https%3A%2F%2Fwww.cnyfertility.com%2F&...&tiba=CNY%20Fertility %20%7C%20Making%20Priceless%20Affordable%C2%AE&...&auid=2053072 442.1763909656&...

65.     In this script, upon visiting the home page, the google double click ads were triggered to send an advertisement to the specific user. This script demonstrates that CNY Fertility flags every homepage visitor as part of a Google Ads remarketing audience with the page title "CNY Fertility | Making Priceless Affordable®" and auid=2053072442.1763909656, demonstrating the intentional use of patient data for the re-marketing of reproductive health provider visits.

**CLASS ACTION COMPLAINT**

### ii.   BILL PAY TRACKING

66.    For all patients, www.cnyfertility.com/pay-bill allows patients to pay their bill. Transmission of a patient's interaction and use of this page is indicative of an established patient relationship with CNY Fertility.   Tracking of the data and transmission of user activity confers protection information related to patient status.

67.    The following specific tracking was transmitting PHI in the form of billing activity and patient status to the Unauthorized Third-Party Marketers:

a. **Facebook Pixel** – PageView event with

   tabUrl=https://www.cnyfertility.com/pay-bill/

b. **GA4 & UA** – user_engagement and pageview events with page title "Pay Your Bill | CNY Fertility";

c. **Google Ads Remarketing** – Remarketing hit from the pay-bill page

d. **TikTok Pixel** – Pageview event for pay-bill URL

e. **Twitter/X** – base code event

f. **GTM** – Active container events tracking bill pay

www.facebook.com/tr/?id=548088252351431&ev=PageView&dl=https%3A%2F%2Fwww.cnyfertility.com&rl=https%3A%2F%2Fwww.cnyfertility.com&if=false&ts=1765033882174&sw=5120&sh=1440&v=2.9.244&r=stable&a=dvpixelyoursite&ec=0&o=12317&fbp=fb.1.1763909686648.9638065112&cs_est=true&pm=1&hrl=06a32a&ler=empty&cdl=API_unavailable&plt=620.8000000119209&it=1765033882171&coo=false&eid=848eed7e-30f1-4247-94c4-ac04997fd3ae&cs_cc=1&cas=25413410688272977%2C6105858686118852&pm_metadata=%7B"cd"%3Atrue%7D&dlc=1&rlc=1&exp=s1&expv2[0]=pl0&expv2[1]=el2&expv2[2]=bc1&expv2[3]=mr0&expv2[4]=ct0&rqm=GET

*Figure 1. HAR download showing an active meta pixel and identifier located on bill pay page.*

**CLASS ACTION COMPLAINT**

https://googleads.g.doubleclick.net/pagead/viewthroughconversion/747191147/?random=176503 3881290&cv=11&fst=1765033881290&bg=ffffff&guid=ON&async=1&en=gtag.config&gtm=4 5Pe5c31h1v9126734703za200zd9126734703xec&gcd=13r3r3r3r5ll&dma=0&tag_exp=103116 026~103200004~104527907~104528500~104684208~104684211~105391253~115583767~115 616985~115938465~115938468~116184927~116184929~116217636~116217638~116427529~ 116518834&frm=0&did=dZDk4Nz%2CdZTNiMT&gdid=dZDk4Nz.dZTNiMT&hn=www.goog leadservices.com&npa=0&pscdl=noapi&auid=2053072442.1763909656&uaa=arm&uab=64&ua fvl=Chromium%3B142.0.7444.176%7CGoogle%2520Chrome%3B142.0.7444.176%7CNot_A %2520Brand%3B99.0.0.0&uamb=0&uam=&uap=macOS&uapv=26.2.0&uaw=0&data=event% 3Dgtag.config&rfmt=3&fmt=4

*Figure 2. HAR download showing active Google Analytics (Double Click) configured to track conversion on Bill pay page with identifier.*



*Figure 3. Screenshot taken from cnyfertifility.com/pay-bill showing the network traffic and the meta pixel intercepting and transmitting the user's communication to Meta via Meta Pixel.*

### iii.     TRACKING AFFORDING TREATMENT PAGE

68.     If a patient uses the Website to search for a treatment, and navigates to the "Afford treatment" page, selects either the "Egg Freezing", "IVF package" , or customizes a payment plan using the Fertility Treatment Cost & Payment Plans Self-pay pricing calculator, that information is automatically sent to Google and other third parties via Defendant's Tracking Tools.

**CLASS ACTION COMPLAINT**



*Figure 4a.*



**CLASS ACTION COMPLAINT**

*Figures 4a and 4b. Screenshots taken from cnyfertility.com/affording-treatment/ as the user searches for various treatments and plans. The highlighted sections indicate the various options the user can toggle to adjust pricing indicated on the left panel on figure 2b.*

69.    In the examples above, the user navigated to the "Affording Treatment" page on Defendant's Website. From there, the future patient can toggle between the various costs and self-pay payment plans or choose one of the pre-packaged medication options as depicted in Figure 2a.

70.    Unbeknownst to ordinary patients, this particular webpage—which is undoubtedly used to communicate Private Information for the purpose of seeking medical treatment—contains Defendant's Tracking Tools. The image below shows the "behind the scenes" portion of the website that is invisible to ordinary users. Importantly, each entry in the column represents just



*Figure 5. Image of network traffic showing transmission of data through Google Analytics*

one instance in which Defendant's Tracking Tools sent this particular user's information to Google:

71.    Thus, without alerting the user, Defendant's Tracking Tools send each and every communication the user made via the webpage to Google, and the images below confirm that the communications Defendant sends to Google contain the user's Private Information.

**CLASS ACTION COMPLAINT**



*Figure 6. Screenshot taken from cnyfertility.com/affording-treatment/, which shows the mark-up (user-facing portion of the website) alongside the network traffic. Each entry in the column to the right represents just one instance in which the user's information was transmitted to Goggle via Defendant's Tracking Tools.*

72.    The following image reveals what information is sent to Google when the user takes

the next step and selects which affordable plan they want to proceed with.

*Figure 4. Screenshot taken from user's network traffic report during their treatment search and affordability options.*

73.    The first line of highlighted text, "tid:G- G-0R6VVKJX09" refers to Defendant's

Google Analytics ID and confirms that Defendant has downloaded Google Analytics into its

Source Code for this particular webpage.

74. The line of text that reads "EN pageview" indicates an event that the page was viewed by the user.

75. The additional lines of highlighted text show Defendant has disclosed to Google that the user: (1) is a patient seeking fertility treatment; (2) is seeking the specific fertility treatment of egg freezing; (3) includes the CID that identifies the user based on their Google Account.[13]



*Figure 7. Screenshot of the user's network traffic depicting the user's URL Request headers associated with Defendant's Google Tracking ID: G-0R6VVKJX09*

76. In each of the examples above, the user's website activity and the contents of the user's communications are sent to Google alongside their personally identifiable information.

---

[13] The CID has been blacked out in both Figure 4 and Figure 5 to protect the anonymity of the user in this case.

**CLASS ACTION COMPLAINT**

Several different methods allow marketers and third parties to identify individual website users, but the examples above demonstrate what happens when the website user is logged into their Google account on their web browser or device. When this happens, the website user's identity is revealed via third-party cookies that work in conjunction with the Tracking Tool. For example, the Tracking Tool transmits the user's CID and allows Google to link the user's online communications and interactions to their individual Google Account.

77.     Visitors to this page are evaluating the **financial commitment** of fertility treatment. The page title explicitly references "Treatment Cost, Financing, Insurance" in the context of CNY Fertility, revealing:

    a. Active consideration of fertility treatment
    b. Financial evaluation stage of the patient journey
    c. Interest in fertility treatment financing options

78.     And this page was transmitting the following:

    a. **Facebook Pixel** – PageViews
    b. **GA4 & UA** – Events with page title "CNY Fertility Treatment Cost, Financing, Insurance & More"
    c. **Google Ads** – Remarketing
    d. **TikTok** – Pageview
    e. **Twitter/X** – base code
    f. **GTM** – Active

79.     As a user "CNY Fertility Treatment Cost, Financing, Insurance & More" to Google Ads, proving financial fertility treatment consideration is shared with advertising networks.

**CLASS ACTION COMPLAINT**

https://googleads.g.doubleclick.net/pagead/viewthroughconversion/747191147/?random=17650 33984081&cv=11&fst=1765033984081&bg=ffffff&guid=ON&async=1&en=gtag.config&gtm=4 5Pe5c31h1v9126734703za200zd9126734703xec&gcd=13r3r3r3r5ll&dma=0&tag_exp=103116 026~103200004~104527907~104528501~104684208~104684211~105391253~115583767~115 616985~115938465~115938469~116184927~116184929~116217636~116217638&u_w=5120 &u_h=1440&url=https%3A%2F%2Fwww.cnyfertility.com%2Faffording-treatment%2F&ref=https%3A%2F%2Fwww.cnyfertility.com%2Ffertility-treatments%2F&frm=0&tiba=CNY%20Fertility%20Treatment%20Cost%2C%20Financing%2C %20Insurance%20%26%20More&did=dZDk4Nz%2CdZTNiMT&gdid=dZDk4Nz.dZTNiMT& hn=www.googleadservices.com&npa=0&pscdl=noapi&auid=2053072442.1763909656&uaa=ar m&uab=64&uafvl=Chromium%3B142.0.7444.176%7CGoogle%2520Chrome%3B142.0.7444.1 76%7CNot_A%2520Brand%3B99.0.0.0&uamb=0&uam=&uap=macOS&uapv=26.2.0&uaw=0 &data=event%3Dgtag.config&rfmt=3&fmt=4

*Figure 8. HAR download showing the presence of Google Ads with conversion tracking on active on Treatment and Affording Treatment page.*

#### iv.    TRACKING AND TRANSMITTING EGG DONOR INFORMATION

80.    In addition to collecting patient information, Defendant's website also collects data as it relates to its donors. Egg Donors are prompted to fill out the form below with numerous questions regarding their Personal Information.

81.    Similar to the above screenshots, Defendant is collecting donor information and transmitting it to third parties such as Google.

| dl | https://www.cnyfertility.com/become-an-egg-donor/application/ |
| dr | https://www.cnyfertility.com/become-an-egg-donor/ |
| dt | Egg Donor Application - CNY Fertility |
| en | page_view |

*Figure 9. Screenshot take from the user's traffic report depicting information intercepted by Google revealing that user is applying to be an egg donor.*

82.    As discussed in depth above, Google intercepts the patient's website activity and the contents of their communications alongside their personally identifiable information. This personally identifiable information includes the "cid" or the client id along with various cookies

**CLASS ACTION COMPLAINT**

that allow Google to link the patient's activity on the Website—and the internet in general—with an individual Google Account.

83.    In addition, Defendant's Website also utilizes an array of first party and third party cookies. Even if patients reject cookies, they are unknowingly only rejecting third party cookies, i.e. cookies that are "created by a website with a domain name other than the one the user is currently visiting"—i.e., Google. Although Google created these cookies, Defendant is ultimately responsible for the manner in which individual website users were identified via these cookies, and Google would not have received this data but for Defendant's implementation and use of the Tracking Tools throughout its Website. Beyond these third-party cookies, CNY reveals its website visitors' identities via first first-party cookies such as the _ga cookie that Google uses to identify a particular browser and a user:[14]

| _ga | GA1.2.1252736384.1770220115 | .cnyfertility.com |

*Figure 10. Screengrab from Defendant's network traffic report depicting the first party cookie _ga.*

84.    Plaintiff and the Class did not (and could not) give their consent for CNY to disclose or procure other third parties to collect their sensitive behavior on the website that reveals their desired treatments. The Tracking Tools embedded by Defendant were being surreptitiously operated without the Plaintiff's or Class Member's knowledge.

### *v.*    PATIENT RESOURCE AND PORTAL TRACKING

85.    The patient resource page located at www.cnyfertility.com/patient resources provides patient portal access and other resources.

86.    The specific Tracking Tools on the patient resource page included the following:

g.    **Facebook Pixel** – Transmitting multiple PageView events
h.    **GA4 & UA** – Transmitting specific Events with page title "Patient Portal & Resources | CNY Fertility"
i.    **Google Ads** – Remarketing

---

[14] *Id.*

**CLASS ACTION COMPLAINT**

j.  **TikTok** – Pageview
k.  **Twitter/X** – base code
l.  **GTM** – Active

87.    The "Patient Portal & Resources" page title explicitly identifies users as patients

accessing clinical resources -- This page title confirms patient status.  Unauthorized Third Party

Marketers can therefore infer that users on this page have an established relationship with CNY

Fertility and are managing their fertility treatment.

88.    As the patient moved to log into the patient portal, the event tracking was likely

capturing the button clicks of the users logging into the portal. This event tracking provided Google

with direct knowledge of patient status and activity with CNY Fertility.

89.    Moreover, the page view and log in events were connected to the Google Ads to

retarget these patients.

https://googleads.g.doubleclick.net/pagead/viewthroughconversion/747191147/?random=176503 3902533&cv=11&fst=1765033902533&bg=ffffff&guid=ON&async=1&en=gtag.config&gtm=4 5Pe5c31h1v9126734703za200zd9126734703xec&gcd=13r3r3r3r5ll&dma=0&tag_exp=103116 026~103200004~104527907~104528500~104684208~104684211~105391252~115583767~115 938465~115938469~116184927~116184929~116217636~116217638&u_w=5120&u_h=1440& url=https%3A%2F%2Fwww.cnyfertility.com%2Fpatientresources%2F&ref=https%3A%2F%2F www.cnyfertility.com%2Fpaybill%2F&frm=0&tiba=Patient%20Portal%20%26%20Resources% 20%7C%20CNY%20Fertility&did=dZDk4Nz%2CdZTNiMT&gdid=dZDk4Nz.dZTNiMT&hn= www.googleadservices.com&npa=0&pscdl=noapi&auid=2053072442.1763909656&uaa=arm& uab=64&uafvl=Chromium%3B142.0.7444.176%7CGoogle%2520Chrome%3B142.0.7444.176 %7CNot_A%2520Brand%3B99.0.0.0&uamb=0&uam=&uap=macOS&uapv=26.2.0&uaw=0&d ata=event%3Dgtag.config&rfmt=3&fmt=4

*Figure 10. HAR download showing active Google Double Click configured on Patient Portal and Resources Page with identifier.*

**CLASS ACTION COMPLAINT**

### vi.    CONTACT PAGE FORM TRACKING

90.     This page allows visitors to contact CNY Fertility, likely to inquire about fertility treatments or schedule consultations.

91.     The specific Tracking Tools on the patient resource page included the following:

a.    **Facebook Pixel** – PageView
b.    **GA4 & UA** – Events with page title "Contact Us | CNY Fertility"
c.    **Google Ads** – Remarketing
d.    **TikTok** – Pageview
e.    **Twitter/X** – base code
f.    **GTM** – Active

92.     Users contacting CNY Fertility are likely initiating a patient relationship or inquiring about fertility treatment options. This intent is shared with six advertising platforms before any form submission occurs.

www.facebook.com/tr/?id=548088252351431&ev=PageView&dl=https%3A%2F%2Fwww.cnyfertility.com&rl=https%3A%2F%2Fwww.cnyfertility.com&if=false&ts=1765033915514&sw=5120&sh=1440&v=2.9.244&r=stable&a=dvpixelyoursite&ec=0&o=12317&fbp=fb.1.1763909686648.9638065112&cs_est=true&pm=1&hrl=095ad4&ler=empty&cdl=API_unavailable&plt=262&it=1765033915512&coo=false&eid=3ead08a6-65cf-41a5-a64d-3d5a3620f629&cs_cc=1&cas=25413410688272977%2C25176353965297495%2C8458717387536047%2C6105858686118852&pm_metadata=%7B"cd"%3Atrue%7D&dlc=1&rlc=1&expv2[0]=pl1&expv2[1]=el2&expv2[2]=bc1&expv2[3]=mr0&expv2[4]=im0&rqm=GET

*Figure 11. HAR download showing active Meta Pixel on the Contact Form page with identifier.*

93.     As a user submits a contact form, the Event associated with the submission of the form is also submitted to Google. This event tracking provided Google with direct knowledge of patient status and activity with CNY Fertility. Moreover, the page view and log in events were connected to the Google Ads allowing Defendant to retarget these patients.

94.     Without Discovery, it is unknown what fields from the "Contact Us" form were submitted to Google, Meta or other Unauthorized Third-Party Marketers.



*Figure 12. Screenshot showing active Meta Pixel transmitting data to Meta through the Contact Us page.*

### vii.    FERTILITY TREATMENT PAGE TRACKING

95.    The Fertility Treatment page located at www.cnyfertility.com/fertility-treatments is one of the most sensitive pages on the Website, explicitly listing fertility treatment options including IVF, IUI, donor eggs & sperm, and surgeries.

96.    The specific tracking included the following:

g.  **Facebook Pixel** – Multiple PageView events for the fertility-treatments URL
h.  **GA4** – Events with page title "**Fertility Treatments: IUI, IVF, Donor Eggs & Sperm, Surgeries and More**"
i.  **UA** – Pageview events
j.  **Google Ads** – Remarketing
k.  **TikTok** – Pageview
l.  **Twitter/X** – base code
m.  **GTM** – Form interaction events captured

97.    The page title "Fertility Treatments: IUI, IVF, Donor Eggs & Sperm, Surgeries and More" is transmitted to all six advertising platforms, explicitly revealing:

**CLASS ACTION COMPLAINT**

n.  Interest in IVF (in vitro fertilization)
o.  Interest in IUI (intrauterine insemination)
p.  Interest in donor eggs and sperm
q.  Interest in fertility surgeries

98.    Users interacting with the Fertility Treatment page are likely initiating a patient relationship or current patients inquiring about fertility treatment options. This intent is shared with six advertising platforms before any form submission occurs.

99.    The page title names specific fertility treatments (IVF, IUI, donor eggs/sperm), constituting PHI.

100.    As a user patient submits a treatment form, the Event associated with the submission of the form is also submitted to Google and any other Tracking Tools in the GTM container. This event tracking provided Google and potentially others with direct knowledge of patient status and treatment activity with CNY Fertility.

101.    Moreover, the page view and for submission events were connected to the Google Ads allowing Defendant to retarget these patients along with the specific auid identifier. Defendant along with the marketing tools inherent with Meta, Google and Tick Tok can then build audiences to target people researching IVF and IUI.

https://googleads.g.doubleclick.net/pagead/viewthroughconversion/747191147/?random=176503 3925775&cv=11&fst=1765033925775&bg=ffffff&guid=ON&async=1&en=gtag.config&gtm=4 5Pe5c31h1v9126734703za200zd9126734703xec&gcd=13r3r3r3r5ll&dma=0&tag_exp=103116 026~103200004~104527906~104528501~104684208~104684211~105391253~115583767~115 938466~115938468~116184927~116184929~116217636~116217638~116518834~116682875 &u_w=5120&u_h=1440&url=https%3A%2F%2Fwww.cnyfertility.com%2Ffertilitytreatments% 2F&ref=https%3A%2F%2Fwww.cnyfertility.com%2Fcontact%2F&frm=0&tiba=Fertility%20Tr eatments%3A%20IUI%2C%20IVF%2C%20Donor%20Eggs%20%26%20Sperm%2C%20Surge ries%20and%20More&did=dZDk4Nz%2CdZTNiMT&gdid=dZDk4Nz.dZTNiMT&hn=www.go ogleadservices.com&npa=0&pscdl=noapi&auid=2053072442.1763909656&uaa=arm&uab=64& uafvl=Chromium%3B142.0.7444.176%7CGoogle%2520Chrome%3B142.0.7444.176%7CNot_ A%2520Brand%3B99.0.0.0&uamb=0&uam=&uap=macOS&uapv=26.2.0&uaw=0&data=event %3Dgtag.config&rfmt=3&fmt=4
*Figure 13.  HAR download showing active Google Double configured with conversion tracking and identifiers on Fertility Treatment Page.*

**CLASS ACTION COMPLAINT**

102.    Without Discovery, it is unknown what fields from the forms were submitted to Google, Meta or other Unauthorized Third-Party Marketers.

### xii.    PURCHASE FERTILITY TREATMENT TRACKING

103.    The Purchase Fertility Treatment page located at www.cnyfertility.com/purchase allows visitors to purchase fertility treatments directly, representing the most commercially sensitive fertility page.

104.    The page title explicitly states "Purchase Fertility Treatments", revealing commercial healthcare transaction intent

105.    Tracking Tools included the following:

a. **Facebook Pixel** – PageView
b. **GA4 & UA** – Events with page title "**Purchase Fertility Treatments | CNY Fertility**"
c. **Google Ads** – Remarketing
d. **TikTok** – Pageview
e. **Twitter/X** – base code
f. **GTM** – Active

106.    The purchase page represents the **conversion point** where visitors become patients. The page title "Purchase Fertility Treatments | CNY Fertility" explicitly reveals:

a. Intent to **purchase** fertility treatments
b. Commercial transaction with a fertility provider
c. Confirmation of fertility care decision

107.    Facebook, Google, TikTok, and Twitter all receive notification that the user is on a fertility treatment purchase page

108.    **Conversion tracking**: Google Ads treats this as a high-value conversion event, sharing purchase intent with advertising networks

109.    This PHI disclosure is highly egregious because it moves beyond research to an **active purchase intent**. At this point in the journey, the patient is confirmed as a patient.

**CLASS ACTION COMPLAINT**

110.    As seen below, CNY Fertility transmits the page title "Purchase Fertility Treatments | CNY Fertility" to Google Ads Remarketing, creating a conversion audience of people purchasing fertility services.

googleads.g.doubleclick.net/pagead/viewthroughconversion/747191147/?random=176503 3989380&cv=11&fst=1765033989380&bg=ffffff&guid=ON&async=1&en=gtag.config& gtm=45Pe5c31h1v9126734703za200zd9126734703xec&gcd=13r3r3r3r5ll&dma=0&tag_ exp=103116026~103200004~104527906~104528501~104684208~104684211~10539125 2~115583767~115938466~115938468~116184927~116184929~116217636~116217638~ 116474638&u_w=5120&u_h=1440&url=https%3A%2F%2Fwww.cnyfertility.com%2Fpu rchase%2F&ref=https%3A%2F%2Fwww.cnyfertility.com%2Faffording-treatment%2F&frm=0&tiba=Purchase%20Fertility%20Treatments%20%7C%20CNY%2 0Fertility&did=dZDk4Nz%2CdZTNiMT&gdid=dZDk4Nz.dZTNiMT&hn=www.googlea dservices.com&npa=0&pscdl=noapi&auid=2053072442.1763909656&uaa=arm&uab=64 &uafvl=Chromium%3B142.0.7444.176%7CGoogle%2520Chrome%3B142.0.7444.176% 7CNot_A%2520Brand%3B99.0.0.0&uamb=0&uam=&uap=macOS&uapv=26.2.0&uaw= 0&data=event%3Dgtag.config&rfmt=3&fmt=4

*Figure 14. HAR download showing active Google Double configured with conversion tracking and identifiers on Purchase Fertility Page.*

111.    The Class Members can be easily identified through Defendant's purchase/tracking records linked by the conversion tracking tag.

## C.    *Google Tools- PHI Disclosed & Exchanged for Targeted Advertising*

112.    Defendant and Google collected vast quantities of Plaintiff's and Class Members Private Information through both Universal Analytics and GA4 by tracking what every user communicated to Defendant's website.[15]

113.    The Website was configured with Google Analytics, Google Ads, and Google Tag Manager allowing for tracking across the various pages on the Website and retargeting advertisement.

---

[15] Amrita Singh, *Comparing Google Analytics vs Facebook Pixel*, Boltic (Nov. 17, 2022), https://www.boltic.io/blog/google-analytics-vs-facebook-pixel.

**CLASS ACTION COMPLAINT**

114.    As Plaintiff and Class Members navigated the Website, Google Analytics recorded the exact page and title viewed, and Google Ads would fire conversion trackers marking the user as a potential patient.

115.    As discussed above, Defendant's Source Code configured with Universal Analytics and GA-4 manipulated Plaintiff's and Class Members' browsers by secretly instructing it to duplicate the patient's communications (HTTP Requests) with Defendant and to send those communications to Google. These transmissions also occurred contemporaneously, invisibly, and without Plaintiff's or Class Members' knowledge.

116.    As the Plaintiff and Class Members navigated the Website, Google Analytics send would send a special "file download" event to its servers containing: (1) exact file name "facesheet.pdf"; (2) the full URL to the medical form; (3) time on the page before downloading; and (4) assigns a permanent tracking ID linking the user to all previous visits.

117.    Google uniformly stored a unique identifier in its logs for each Plaintiff and Class Member, whether in private browsing mode or non-private browsing mode.  The unique identifier can then be used to connect the individual with the collected browsing activities on that Website. Google then uses the identifiable behavioral data for serving personalized ads.[16]

---

[16] *See Brown v. Google LLC*, Case No. 4:20-cv-3664-YGR, 2023 WL 5029899 (N.D. Cal. Aug. 7, 2023) (Order denying summary judgment and citing internal evidence from Google employees). Google also connects user data to IP addresses, IP addresses have been classified by the United States Department of Health and Human Services ("HHS") as personally identifying information. "Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates", HHS, available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Dec. 20, 2023) ("Such PHI may include, for example, an individual's IP address . . .").

118. If the Plaintiff or Class Member was logged in to their Google accounts while navigating the Website, Google's logs would include an additional identifier to further match an individual's browsing activities for additional tracking to serve personalized ads.[17]

119. To be sure, Defendant and Google tracked each Plaintiff and Class Member, whether Google or not, with persistent IDs through Universal Analytics and Google Ad Words who visited the Website.

120. As a direct result, Defendant disclosed confidential communications and PHI to Google in the forms of page views and events relating to the past, present and future medical care of Plaintiff's and Class Members. Without discovery, Plaintiff is unable to know precisely the configuration in the Google Tag Manager Container or to determine precisely what form content and fields may also have been disclosed.

121. At a minimum, Defendant disclosed sufficient Private Information from which Google could infer Plaintiff's and Class Members' patient status

122. By installing and implementing Google Analytics, Defendant caused Plaintiff's and Class Member's communications to be intercepted by and/or disclosed to Google and for those communications to be personally identifiable.

123. Due to the vast network of information held by Google and its highly sophisticated algorithm, Google can easily and reliably match the IP addresses, device information, and the unique identifiers to connect an individual with the tracked browsing activity.

124. Google then utilizes such information to design and offer tailored marketing products such as Google Ad Words, which can be used for targeted advertising on those individuals.

---

[17] *See Brown v. Google LLC*, Case No. 4:20-cv-3664-YGR, FN11 (Google employee deposition testimony explaining how Google tracks user data).

**CLASS ACTION COMPLAINT**

125.    Defendant gained access to and utilized these powerful and valuable retargeting products in exchange for Plaintiff's and Class Members' Private Information.

**D.  *Meta Pixel- Business Suite – PHI Disclosed & Exchanged for Targeted Advertising***

126.    Defendant and Meta collected vast quantities of Plaintiff's and Class Members Private Information through the Meta Pixel.

127.    The Meta Pixel is a specific type of tracking pixel that connects a web user's browsing activity directly to the Meta advertising ecosystem (Facebook and Instagram). It offers highly valuable and effective integration between the data collected on a website with advertising campaigns through Meta platforms that include Meta Business Suites and Meta Ads Manager.

128.    By installing and implementing the Meta Pixel, Defendant caused Plaintiff's and Class Member's communications to be intercepted by and/or disclosed to Meta and for those communications to be personally identifiable.

129.    After intercepting and collecting the Private Information, Meta processes the data, analyzes it, segments and assimilates it into datasets like Core Audiences and Custom Audiences. If the Website visitor is also a Facebook user, Meta will associate the collected information with a Facebook ID that identifies their name and Facebook profile, i.e., their real-world identity. A user's Facebook Profile ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Meta—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the user's corresponding Facebook profile.

130.    In addition to Website analytics, Meta Pixel created value for the Defendant by providing Defendant with access to sophisticated algorithms and computer learning (AI) tools that allowed the Defendant to further utilize Plaintiff's and Class Members' behavioral data that was

collected from the Website to build highly targeted audiences. These audiences include both custom audiences and look-a-like audiences.

131. A "custom audience" is used to re-target users who have previously visited a website or taken specific actions on the website. For example, if a user visited Defendant's Website and didn't request an appointment, a custom audience could be built from the data gathered from the Meta Pixel to retarget those users with specific ads to try to get them to come back to the Website to schedule an appointment.

132. A "look-a-like audience" is designed to with the goal of reaching new potential customers who share similar characteristics, behaviors, and demographics as the existing high value customers tracked by the Meta Pixel. In this scenario, if Defendant wanted to target potential patients for hip replacement surgery, it could analyze, segment and use the data collected from patients who completed book an appointment forms for hip replacement surgery to build a look-a-like audience. That audience would then be used in combination with Meta's vast ecosystem and advertising platform to get ads in front of individuals with the same or similar profiles as the current hip replacement patients of Defendant.

133. The Meta Pixel further provides real time data to Meta's algorithms, allowing for automatic optimization of ad delivery. Meta's systems use the data provided from the Meta Pixel to learn and predict which users are more likely to convert and complete a request for appointment and will automatically target those potential patients to maximize the ad spend. In other words, the powerful Meta algorithm that has been gathering data from all aspects of the internet incorporate patient data from the Website to place digital advertisements in front of audiences with the greatest chance of becoming a new patient of Defendant. The per patient conversion cost is then expected to be far lower than if Defendant attempted to use less sophisticated and targeted forms of

**CLASS ACTION COMPLAINT**

advertising like traditional media, where the add impression cost is much higher and the cost to convert a patient is higher.

134. Upon information and belief, Defendant was also aware of the Meta tools designed to transmit data directly to Facebook through the use of first-party cookies called Facebook's Conversions Application Programming Interface ("CAPI"), which is a server-to-server transmission.

135. CAPI is another Facebook tool that functions as an alternative measure to circumvent any ad blockers or other denials of consent by the website user by transmitting information directly from Defendant's servers to Facebook's servers.[18, 19] Facebook markets CAPI as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[20]

136. Defendant is in exclusive control over whether CAPI was implemented, but the availability of the Tool shows notice of the privacy concerns when utilizing the Meta Pixel.

137. Moreover, while Defendant is in exclusive control of any audience marketing campaigns it built and utilized, the presence of targeted Facebook advertisements online indicates

---

[18] Reggie Paquette, *What is the Facebook Conversions API and how to use it*, Birch (Mach 5, 2021), https://bir.ch/blog/facebook-conversions-api.

[19] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel…. This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels.", https://developers.facebook.com/docs/marketing-api/conversions-api (last visited Feb. 26, 2026).

[20] *About Conversions API*, Meta Business Help Center, https://www.facebook.com/business/help/2041148702652965?id=818859032317965 (last visited Feb. 26, 2026).

**CLASS ACTION COMPLAINT**

that Defendant was utilizing Meta Business tools to create audiences and monetize Plaintiff's and Class Members browsing activity and Private Information collected from the Website.

138.    At a minimum, Defendant disclosed sufficient Private Information from which Meta could infer Plaintiff's and Class Members' patient status

### F. TikTok Pixel- PHI Disclosed & Exchanged for Targeted Advertising

139.    TikTok has extensive data collection practices. When companies integrate the TikTok pixel on their website, TikTok collects online behavior, shopping preferences, media consumption, and digital footprint.  TikTok also collects email addresses and phone numbers from the pages where it is Tracking and can reveal medical conditions.

140.    Defendant and TikTok collected vast quantities of Plaintiff's and Class Members Private Information through the TikTok Pixel.

141.    Indeed, TikTok makes no reservations and reserves its right to collect highly personal information through its Pixel, including mental and physical health diagnosis, sexual life, sexual orientation, and precise location data.

142.    And it has been reported by BBC that even if you don't use the TikTok app, TikTok can and does collect information about individual users. The BBC reporter noted specifically, that "[o]ver the past week, I've watched websites sending TikTok data about cancer diagnosis, *fertility*, and even mental health crises. Its part of a tracking empire that extends far beyond social media platforms." [21]

143.    The Website uniformly sent TikTok data on Plaintiff and every Class Member regardless of whether Plaintiff or the Class Member was a TikTok user or not.

144.    What is even more concerning is that on January 22nd, 2026, Tick Toks U.S. operation officially changed hands, and TikTok will not be using the data to show ads on other

---

[21] Thomas Germain, *TikTok is Tracking You, Even if You Don't use the App. Here's how to Stop it*, BBC (Feb. 11, 2026), https://www.bbc.com/future/article/20260210-tiktok-is-tracking-you-even-if-you-dont-use-the-app-heres-how-to-stop-it.

**CLASS ACTION COMPLAINT**

websites is increase its new advertising system. This increase in reach and power will provide greater incentive for a company like Defendant to continue to use the tool while trading its patient list for access.

145.    And an investigation by Disconnect found that TikTok's pixel now collects more information than ever before, "automatically intercepting data what websites are sending to Google." [22]

146.    Upon information and belief, Defendant placed the TikTok pixel in order to allow TikTok to collect the data for the purpose of showing targeted advertisements on the TikTok platform. In order to gain access to these tools, Defendant traded Plaintiff's and Class Members' Private Information.

147.    At a minimum, Defendant disclosed sufficient Private Information from which TikTok could infer Plaintiff's and Class Members' patient status.

### E.  X  Pixel - PHI Disclosed & Exchanged for Targeted Advertising

148.    Defendant and X (formerly known as "Twitter") collected vast quantities of Plaintiff's and Class Members Private Information through the X Pixel.

149.    The X Pixel is a website tracking tag used for conversion tracking, retargeting, and advertising optimization.

150.    As enabled by Defendant, X collected vast quantities of Plaintiff's and Class Members data through the X Pixel.

151.    The X Pixel utilizes first party cookies to collect Private Information each time a user visits a webpage where its pixel's baseline code is installed.

152.    The base code, as installed here, automatically collected Plaintiff and Class Members page loads and page visit records, the website domains and URL paths and sent that Private Information to X for analytics to measure and optimize ad performance.

---

[22] *Id.*

**CLASS ACTION COMPLAINT**

153. The X Pixel uses several identifiers as noted above to match the website activity to a specific individual including cookies IDs, click IDs, and email addresses, and it can track user activity across different devices for conversion tracking.

154. Without discovery to inspect the event code and full source code and configuration settings, Plaintiff is unable to determine whether additional events were configured to capture more sensitive data from form content, conversions, button clicks, sign-ups, or other custom events.

155. At a minimum, Defendant disclosed sufficient Private Information from which X could infer Plaintiff and Class Members patient status.

156. Upon information and belief, Defendant implemented the X pixel in order to allow X to collect the data for the purpose of showing targeted advertisements on the X platform. In order to gain access to these valuable tools, Defendant traded Plaintiff and Class Members Private Information.

## F. Defendant Was Enriched and Benefitted from the Use of the Tracking Technology and Private Information Had Financial Value

157. The Tracking Tools served the sole purpose of bolstering Defendant's profits via marketing and advertising.

158. In exchange for bartering away and disclosing the Private Information of its patients and customers, CNY is compensated by Meta, Google, TikTok, and X and the like in the form of enhanced advertising services and more cost-efficient marketing.

159. Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions. Upon information and belief, as part of its marketing campaign, CNY re-targeted patients and potential patients.

160. By utilizing the Tracking Tools, the cost of advertising and retargeting was reduced, thereby benefiting Defendant.

161. CNY's disclosure of Private Information harmed Plaintiff and Class Members. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user

**CLASS ACTION COMPLAINT**

from mining and selling data. That figure is expected to continue to increase and estimates for 2022 were as high as $434 per user, constituting over $200 billion industry wide.

162.    The value of health data in particular is well-known. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data, observing that the market for this data is both lucrative and a significant risk to privacy.[23]

163.    Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[24] Accordingly, patient data that can be linked to a specific individual is even more valuable.

164.    There is also a market for data in which consumers can participate.  Personal information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy.  Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

165.    Several companies have products through which they pay consumers for a license to track their data.  Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing historical information.

166.    Additionally, healthcare data is extremely valuable to bad actors. Health care records may be valued at up to $250 per record on the black market.[25]

---

[23] *See* Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, TIME (Jan. 9, 2017), https://time.com/4588104/medical-data-industry/.

[24] *See* Christina Farr, *Hospital execs say they are getting flooded with requests for your health data*, CNBC (Dec. 18, 2019), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

[25] Tori Taylor, *Hackers, Breaches, and the Value of Healthcare Data,* SECURELINK (June 30, 2021), https://www.securelink.com/blog/healthcare-data-new-prize-hackers.

**CLASS ACTION COMPLAINT**

167.    Personal information has private value beyond its use as a bare commodity.[26] The value of personal information is thus inherently related to the value of privacy, which is a question that has been researched in multiple fields including decision science, economics, information systems, management, health care, and marketing.[27] This research has approached the valuation of personal information from multiple perspectives:[28]

    a.      The amount one would accept to relinquish their data;

    b.      The amount one would spend to protect their data;

    c.      The potential harm from data exposure; and

    d.      The benefit a data holder could gain from acquiring data.

168.    These approaches can be used to establish a set of data points for the reasonable estimation of the value of personal information and non-public medical information such as patient status.

169.    In addition, numerous services exist that charge fees to monitor and remove personal information from data brokers and search databases. For example, Privacy Bee charges between $96 and $804 per year (depending on the features selected by the user).[29] Other similar services exist today, such as DeleteMe®, which removes information from all major data broker websites for $129 per year,[30] deleteme™ which charges one-time fees ranging from $100 to $500 for search engine and data breach removals,[31] and Incogni.com which charges between $95.88 (individual plan) and $275.88 (family plan) per year to remove information from major data broker

---

[26] *See, e.g.*, Wagner, et. al (2018); Alessandro Acquisti et al, *The Economics of Privacy*, 54 JOURNAL OF ECON. LITERATURE 442 (2016); Xiao-Bai Li et al, *Valuing Personal Data with Privacy Consideration*, 52 DECISION SCI. 393 (2021).

[27] Fehrenbach David & Carolina Herrando, *The Effect of Customer-Perceived Value When Paying for a Product With Personal Data: A Real-Life Experimental Study*, 137 J. OF BUS. RES. 222 (2021); Xiao-Bai Li et al, *Valuing Personal Data with Privacy Consideration*, 52 DECISION SCI. 393 (2021); Alorwu, et al. (2024).

[28] Alessandro Acquisti, et al., *The Economics of Privacy*, 54 J. OF ECON. LITERATURE 442 (2016).

[29] *Pricing and License Cost*, PRIVACY BEE (last visited Aug. 26, 2025), https://privacybee.com/pricing/.

[30] *Privacy Protection Plans - JoinDeleteMe*, DELETEME® (last visited Aug. 26, 2025), https://joindeleteme.com/privacy-protection-plans/#2-years.

[31] *Services Pricing*, DELETEME™ (last visited Aug. 26, 2025), https://www.deleteme.com/pricing/.

**CLASS ACTION COMPLAINT**

websites and search databases[32] These provide a baseline market valuation of personal information.

### G. Data Broker Ecosystem

170.    Data brokers obtain large volumes of consumer information without consumer knowledge to resell the data for marketing campaigns. The FTC has investigated the practices and found that "data brokers collect and store billions of data elements covering nearly every U.S. consumer."[33]

171.    Data brokers combine online and offline data to markets to consumers online. Data brokers combine and analyze data about consumers to make inferences about them, including sensitive inferences related to health conditions.  Some data brokers have been found to store data indefinitely posing significant privacy risks. [34]

172.    Data brokers do not obtain the data directly from consumers, rather they obtain it through various sources including partnerships with third party marketers that utilize tracking tools.  While each data broker source may provide only a few data elements about a consumer's activities a data broker can combine the data sets to form a more detailed profile of the consumer's life.

173.    In fact, the unauthorized data collection from third party trackers, tags, and pixels has resulted in a proliferation and expansion of the data broker ecosystem.  The web trackers serve as pivotal components in the data broker eco system by facilitating the collection of online activities, preferences, and demographics. This aggregated data is then analyzed and sold to various entities interested in understanding consumer behavior and targeting specific demographics. [35]

---

[32] *About Us*, INCOGNI (last visited Aug. 26, 2025), https://incogni.com/about-us.
[33] https://www.ftc.gov/news-events/news/press-releases/2014/05/ftc-recommends-congress-require-data-broker-industry-be-more-transparent-give-consumers-greater (last visited Feb. 24, 2026)
[34] *Id*.
[35] chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://lokker.com/wp-content/uploads/2024/04/LOKKER_Online-Data-Privacy-Report_032024-2.pdf

**CLASS ACTION COMPLAINT**

174. The U.S. data broker market is projected to from from $280.82 billion in 2023 to $382.16 billion in 2030. This expansion is largely driven through the data harvested from the pixels and trackers on the website.

175. As far as medical advertising, the data brokers routinely utilize the data sets to predict which consumers are most likely to use, e.g., brand name medicine, order prescriptions by the mail, research medications online, or response to pharmaceutical ads or other treatment ads. These predictive models are then sold and used for targeted advertising.

176. The lack of transparency in the data brokering ecosystem makes it unknown whether Meta and/or Google sold or traded any of the data they received through the Tracking Technology at issue.

177. However, it is indisputable that the data at issue, given it is medical data, is highly valuable for segmentation and profile building.

178. X, on the other hand, without the robust marketing tools of Goole or Meta, is known to sell and share data collected through its pixel with data brokers.

179. With the X and TikTok pixels on every sensitive page of the Website, it is highly likely the Private Information collected was also subsequently sold to data brokers for additional use in the eco system.

180. Once the data is shared and disclosed to any of the Unauthorized Third-Party Marketers, the Patients, Class Members, and Defendant lose control over its usage and distribution.

## H. Defendant Violated HIPAA and Industry Standards.

181. In December 2022, HHS issued a bulletin (the "HHS Bulletin") warning regulated entities like Defendant about the risks presented by the use of Tracking Tools on their websites:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes,***

**CLASS ACTION COMPLAINT**

*without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.* [36]

182.   In other words, the HHS has expressly stated that entities who implement Tracking Tools, such as Defendant, have violated HIPAA Rules unless they have obtained a HIPAA-complaint authorization from their patients.

183.   The HHS Bulletin further warns that:

While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, *because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.* [37]

184.   In addition, HHS and the FTC have recently issued a letter, once again admonishing entities like Defendant to stop using Tracking Tools:

If you are a covered entity or business associate ("regulated entities") under HIPAA, you must comply with the HIPAA Privacy, Security, and Breach Notification Rules (HIPAA Rules), with regard to protected health information (PHI) that is transmitted or maintained in electronic or any other form or medium. *The HIPAA Rules apply when the information that a regulated entity collects through tracking technologies or discloses to third parties (e.g., tracking technology vendors) includes PHI. . .* Even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule. . . As recent FTC enforcement actions demonstrate, it is essential to monitor data flows of health information to third parties via technologies you have integrated into your website or app. The disclosure of such information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule. [38]

---

[36] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEP'T OF HEALTH & HUMAN SERVS. (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Aug. 26, 2025) (emphasis added).
[37] *Id.*
[38] *Re: Use of Online Tracking Technologies*, U.S. DEPT. OF HEALTH & HUM. SERVS. AND FED. TRADE. COMM'N (July 20, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf.

**CLASS ACTION COMPLAINT**

185.    Under Federal Law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[39]

186.    The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[40]

187.    The Privacy Rule broadly defines "protected health information" ("PHI") as individually identifiable health information ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

188.    IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

189.    Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods

---

[39] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).
[40] *HIPAA For Professionals*, U.S. Dep't of Health & Human Servs. (last visited Aug. 26, 2025), https://www.hhs.gov/hipaa/for-professionals/index.html.

**CLASS ACTION COMPLAINT**

and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed;

> e.  Names;
> ***
> f.  Medical record numbers;
>
> ***
> g.  Account numbers;
>
> ***
> h.  Device identifiers and serial numbers;
>
> i.  Web Universal Resource Locators (URLs);
>
> j.  Internet Protocol (IP) address numbers; … and
>
> k.  Any other unique identifying number, characteristic, or code…; and" The covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 164.514.

190.    The HIPAA Privacy Rule requires any "covered entity"—which includes pharmacies—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

191.    An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d–1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

**CLASS ACTION COMPLAINT**

192.    The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant when it is knowingly disclosing individually identifiable health information relating to an individual, as those terms are defined under HIPAA.

193.    Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

194.    In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, HHS instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[41]

195.    In its guidance for Marketing, HHS further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not*

---

[41] *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule*, U.S. DEP'T OF HEALTH & HUMAN SERVS. (Nov. 26, 2012), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

**CLASS ACTION COMPLAINT**

*sell lists of patients to third parties without obtaining authorization from each person on the list*. (Emphasis added).[42]

196. As alleged above, there is an HHS Bulletin that highlights the obligations of "regulated entities," which are HIPAA-covered entities and business associates, when using Tracking Tools.[43]

197. The Bulletin expressly provides that "[r]egulated entities are not permitted to use Tracking Tools in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules."

198. Defendant's actions violated HIPAA Rules.

### I. IP Addresses, URLs, and Other Devices Identifiers Constitute Personally Identifiable Information.

199. CNY disclosed and otherwise assisted third parties with intercepting Plaintiff's and Class Members' PHI that are uniquely linked to specific individuals.

200. Each platform assigns a durable identifier ensuring the patient can be recognized on future visits across sessions and devices. These include:

| Safe Harbor Item | Evidence from Capture | Impact |
|---|---|---|
| **(M) Device identifiers / serials** | • Facebook_ fbp=fb.1.1763909686648.9638065112; Issues the fbp browser ID that survives future visits<br>• GA4 records cid=2144719496.1763909648 session sid=1765033859, and engagement metadata<br>• Google Ads issues auid=2053072442.1763909656<br>• TikTokissues anonymous_id=01KARKAETNHF2NGX9XCYKF7GHB.tt<br>• Twitter/X (onnrz) — Tracks page visit with unique event IDs | Persistent device IDs survive across sessions, so the data set fails Safe harbor; the |

---

[42] *Marketing*, U.S. Dep't of Health & Human Servs. (rev. Apr. 3, 2003), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.

[43] *See See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Dept. of Health & Human Serv. (rev. June 26, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

**CLASS ACTION COMPLAINT**

| Safe Harbor Item | Evidence from Capture | Impact |
|---|---|---|
| | | persistent IDS allow for retargeting and audience building |
| **(N) Web URLs** | dl=https://www.cnyfertility.com/fertility-treatments/ /sperm-freezing/ purchase | URLs reveal the exact fertility treatment being researched, directly identifying reproductive health context. |
| **(O) IP addresses** | Every HTTPS request to Facebook/Google/TikTok/Twitter includes the visitor's IP (inherent in network requests) | IP transmission to third parties violates Safe Harbor unless removed or obfuscated. |

201.   In addition, an IP address is a number that identifies the address of a device connected to the Internet, and it is used to identify and route communications on the Internet.

202.   Internet service providers, websites, and third-party tracking companies use individual's IP addresses to facilitate and track Internet communications

203.   Defendant used Google Analytics tools, Google Tag Manager, DoubleClick, Meta Pixel, Twitter (X) Pixel, and TikTok tracking tools without anonymizing users' IP addresses.

**CLASS ACTION COMPLAINT**

204.    Under HIPAA, an IP address is considered personally identifiable information:

205.    Moreover, the intercepted communications contained numerous other direct and indirect identifiers. To be considered "de-identified", ALL of the 18 HIPAA Identifiers must be removed from the data set.

206.    Consequently, Defendant unequivocally disclosed identifiable data, and Defendant's business practices violated HIPAA per se.

    i.    *Browser Finger-Printing*

207.    In addition to these personally identifiable persistent identifiers, upon receiving information from Defendant's Websites, Google also utilizes a "browser-fingerprint" to personally identify consumers.  A browser-fingerprint is information collected about a computing device that is used to identify the specific device.

208.    These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden, or cookies are blocked and can provide a wide variety of data.

209.    As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[44]

210.    The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[45]  Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

---

[44] Justin Schuh, *Building a more private web*, GOOGLE, https://blog.google/products/chrome/building-a-more-private-web/.
[45] Chris Hauk, *What Is Browser Fingerprinting? How It Works And How To Stop It*, PIXEL PRIVACY, https://www.pixelprivacy.com/resources/browser-fingerprinting.

**CLASS ACTION COMPLAINT**

211. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[46]

212. Browser-fingerprints are personal identifiers. Google Analytics and other Google tracking tools can collect browser-fingerprints from website visitors.

213. Without discovery and full disclosure of the complete source code, Plaintiff cannot identify all browser fingerprint data at issue. Upon information and belief, additional data points were likely transmitted allowing for more accurate and identifiable fingerprinting.

### J. Plaintiff and Class Members Common Experience

214. Plaintiff and Class Members are Defendant's patients who reside nationwide and received healthcare services from Defendant since August 2022.  As part of the medical services, Plaintiff and Class Members used Defendant's Website to communicate Private Information to Defendant on numerous occasions.  At all times, while using the Website, Plaintiff and Class Members had an expectation of privacy that the Private Information provided to Defendant would remain private and confidential.

215. Plaintiff and Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Information to third parties, nor did they intend for anyone other than Defendant to be a party to their communications (many of them highly sensitive and confidential) with Defendant.

216. Plaintiff and Class Members were not aware that their Private Information would be disclosed to the Unauthorized Third Parties and that Defendant was utilizing their Private Information for marketing purposes because Defendant did not acquire their consent.

217. Plaintiff and Class Members were Facebook and/or Google users.

218. As Plaintiff and Class members used Defendant's Website, the Website's Source Code configured with Tracking Tools sent a secret set of instructions back to the Plaintiff's and

---

46 Yinzhi Cao, Song Li & Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features* (Network & Distributed Sys. Symp., 2017) https://www.ndsssymposium.org/wp-content/uploads/2017/09/ndss2017_02B-3_Cao_paper.pdf.

**CLASS ACTION COMPLAINT**

Class Members' browsers, causing the Tracking Tools to uniformly send Plaintiff's and Class Members' Private Information to the Unauthorized Third Parties.

219.    Accordingly, during the same transmissions, the Website routinely provided the Unauthorized Third-Party Marketers with digital identifiers allowing the Third Parties to connect the Plaintiff and Class Members with their Private Information.

220.    Furthermore, following the disclosure, Plaintiff and Class Members Private Information was aggregated and analyzed through the Unauthorized Third-Party Marketers analytics tools and reports.  From there, the aggregated data could be segmented and linked to specific user profiles for use in building "custom" and "look- a-like audiences" and was incorporated into the Unauthorized Third-Party Marketers algorithms for other avenues of re-targeting.

221.    Once released to the digital marketing ecosystem, the collected data may also be shared or combined with data broker aggregated data and profiles for additional marketing reach.

222.    Upon information and belief, Defendant monetized Plaintiff's and Class Members' Private Information by building custom and look-a-like audiences to target and re-target patients and potential patients and donors. By utilizing the Unauthorized Third Party Marketer's tools, Defendant was able to save substantial marketing costs while increasing its cost per conversion, as well as likely increasing its overall new patient conversion.

### K.  Plaintiff's Representative Website Experience

223.    Plaintiff's experiences using the Website is representative of the Class she seeks to represent.

224.    As a patient of Defendant, and with the encouragement of Defendant, Plaintiff frequently accessed Defendant's Website on her computer and/or mobile device for the purpose

**CLASS ACTION COMPLAINT**

of finding and obtaining medical treatment for fertility treatment including immunology and multiple egg retrievals and transfers.

225. As Defendant's patient, Plaintiff reasonably expected that her online communications with Defendant were solely between herself and Defendant and that such communications would not be transmitted to or disclosed to a third party or utilized for marketing purposes without her consent.

226. Furthermore, at all times that she utilized the Website, Plaintiff was a California resident had an active Facebook account.

227. Plaintiff used Defendant's Website for a variety of medical services, and she visited one or more of the sensitive pages listed above that contained the Tracking Tools.

228. Specifically, she submitted confidential medical information and engaged in confidential communications through Defendant's Website, including:

    a. Making payments for embryo storage

    b. Requesting and booking appointments,

    c. Searching and researching medical conditions and symptoms

    d. Searching and researching specific physicians

    e. Utilizing the chat features when communicating medical concerns

    f. Contacting her physician

    g. Completing confidential web forms

    h. Reviewing lab and diagnosis imaging results

    i. Enrolling in support group classes

**CLASS ACTION COMPLAINT**

229.   Following her visits to Defendant's Website, Plaintiff observed targeted advertisements on her Facebook account, Instagram and Smart TV/ Roku related to the treatments she sought and received through medical providers she viewed on Defendant's Website.

## L. Class Wide Injuries, Damages, and Remedies

230.   As a direct and proximate result of CNY's conduct, Plaintiff and Class Members have suffered numerous harms and injuries, including invasion of privacy, breach of fiduciary duty, breach of confidentiality, loss of control of their Private Information, misappropriation of their Private Information, conversion of their Private Information, and the ongoing invasion of privacy  and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

231.   Consequently, Plaintiff individually and on behalf of the putative Class, brings this class action for legal and equitable remedies to address and rectify the illegal and tortious conduct and actions described herein. Plaintiff and the putative Class have suffered and seek the following damages: compensatory, loss of benefit of the bargain, conversion (FMV value of the use of the data for marketing), statutory damages, and in the alternative, nominal.

232.   Plaintiff also seeks consequential and future damage for reasonably and necessary data monitoring services including data broker and dark web monitoring, as well as the cost of removing the disclosed data and profiles from data broker networks.

233.   Plaintiff further seeks restitution, disgorgement of profits or cost savings obtained from the improper use and misappropriation of Plaintiff's and Class Members' Private Information.

234.   Finally, Plaintiff seeks injunctive relief to address the ongoing invasion of privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

235.   The injunctive relief sought includes:

a.   Removal of the Tracking Tools from sensitive parts of the Website;

b.   Deletion of all analytics data collected through the Tracking Tools that includes Private Information;

c.   Deletion of all audience profiles and campaigns built data gathered from the Tracking Tools and build from Plaintiff's and Class Member's Private Information;

d.   Deletion of Plaintiff's and Class Member data from all identifiable third party broker lists;

e.   Enjoinment from utilizing any of the Tracking Tools at issue in this matter in the future on any sensitive Website pages.

f.   Enjoinment from utilizing any other tracking technology or marketing services without first obtaining HIPAA compliance patient consent and BAA agreements with the third parties.

g.   Other relief as ordered by the Court.

**CLASS ACTION COMPLAINT**

## TOLLING

236. Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiff did not know (and had no way of knowing) that her PII and PHI was intercepted and unlawfully disclosed to Google because Defendant kept this information secret.

## CLASS ACTION ALLEGATIONS

237. Class Definition: Plaintiff brings this action on behalf of themselves and other similarly situated individuals defined as follows:

**Nationwide Class:** United States citizens who, during the class period, used Defendant's Website and had their Private Information disclosed as a result of using the Website.

**California Sub-Class:** All California residents who, during the Class Period, used Defendants' Website and had their Private Information disclosed as a result of using the Website.

238. Plaintiff reserves the right to modify the class definitions or add sub-classes as needed prior to filing a motion for class certification.

239. The "Class Period" is the period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement or preliminary approval of a settlement.

240. Excluded from the Class are Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

241. **Numerosity/Ascertainability.** Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff currently. However, it is estimated that there are thousands of individuals in

**CLASS ACTION COMPLAINT**

the Class. The identity of such membership is readily ascertainable from Defendants' business records.

242.    **Typicality.** Plaintiff's claims are typical of the claims of the Class because Plaintiff used Defendants' Website and had her personally identifiable information and protected health information disclosed to third parties such as Google without her express written authorization or knowledge. Plaintiff's claims are based on the same legal theories as the claims of other Class Members.

243.    **Adequacy.** Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiff's interests coincide with, and are not antagonistic to, those of the Class Members.  Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the Class Members.

244.    **Common Questions of Law and Fact Predominate/Well Defined Community of Interest**. Questions of law and fact common to the Class Members predominate over questions that may affect only individual Class Members because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct.  The following questions of law and fact are common to the Class:

a.  Whether CNY intentionally tapped the lines of internet communication between patients and their medical providers;

b.  Whether the Website surreptitiously tracked PII, PHI, and related confidential communications and simultaneously disclose(d) that Private Information to Meta, Google, TikTok and Twitter;

c.  Whether Meta, Google, TikTok and Twitter are  third-party eavesdroppers;

d.  Whether CNY's disclosures of PII, PHI, and related confidential communications constitute an affirmative act of communication;

**CLASS ACTION COMPLAINT**

e. Whether CNY's conduct, which allowed third parties to view, collect, aggregate, and monetize Plaintiff's and Class Members' PII and PHI, resulted in a breach of confidentiality;

f. Whether CNY violated Plaintiff's and Class Members' privacy rights by using Tracking Tools to communicate patients' Private Information to Meta, Google, TikTok and X;

g. Whether CNY violated Plaintiff's and Class Members' privacy rights by using Plaintiff's and Class Members' Private Information in marketing tactics and campaigns without Plaintiff's and Class Members' expressed written consent.

h. Whether CNY violated HIPAA by failing to obtain expressed written consent from Plaintiff and Class Members before disclosing and using the Private Information for marketing purposes;

i. Whether Plaintiff and Class Members are entitled to statutory damages under the ECPA, CIPA and other relevant statutes;

j. Whether CNY's actions violated the Unfair Competition Law;

k. Whether CNY's actions violated Plaintiff's and Class Members' privacy rights as provided by the California Constitution;

l. Whether Plaintiff and Class Members are entitled to restitution or disgorgement of profits from the unauthorized use of their Private Information for marketing purposes;

245. **Superiority.** Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons a method for obtaining redress on claims that could not practicably be pursued

**CLASS ACTION COMPLAINT**

individually, substantially outweighs potential difficulties in management of this class action. Plaintiff is unaware of any special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### COUNT I
### BREACH OF FIDUCIARY DUTY/CONFIDENTIALITY
**(On Behalf of Plaintiff and the Nationwide Class)**

246.    Plaintiff incorporates all prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

247.    Medical providers have a duty of confidentiality to their patients to keep non-public medical information completely confidential, and to safeguard sensitive personal and medical information. This duty arises from the implied covenant of trust and confidence that is inherent in the physician-patient relationship.

248.    As a fiduciary of the Private Information and medical provider, Defendant further owed Plaintiff and Class Members a duty of loyalty that precluded the misuse and misappropriation of Plaintiff's and Class Members Private Information.

249.    In light of the special relationship between Defendant and Plaintiff and Class Members, whereby Defendant became a guardian of Plaintiff's and Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for the benefit of its patients, including Plaintiff and Class Members: (1) for the safeguarding of Plaintiff's and Class Members' Private Information; and  (2) to only use the information for the authorized purpose.

**CLASS ACTION COMPLAINT**

250.    Plaintiff and Class Members had reasonable expectations of privacy in their Private Information and the related confidential communications exchanged with Defendant through the Website.

251.    Plaintiff and Class Members also reasonably expected that their Private Information would only be utilized for medical purposes.

252.    Plaintiff and Class Members did not provide consent for Defendant to appropriate or use their Private Information for commercial and digital marketing purposes.

253.    Contrary to its duties as a fiduciary and medical provider and its express and implied promises of confidentiality, Defendant installed Tracking Tools with the intent and purpose to disclose and transmit Plaintiff's and Class Members' Private Information to Google, Meta, TikTok, and X.

254.    The unauthorized disclosures of Plaintiff's and Class Members' Private Information were intentionally caused by Defendant's employees acting within the scope of their employment with the purpose of marketing for new patients. Alternatively, the disclosures of Plaintiff's and Class Members' Private Information occurred because of Defendant's negligent hiring or supervision of its employees, its failure to establish adequate policies and procedures to safeguard the confidentiality of patient information, or its failure to train its employees to properly discharge their duties under existing privacy policies and procedures.

255.    Defendant's breach of their fiduciary duties implied covenants of trust, loyalty, and confidence is evidenced by its failure to comply with federal and state privacy regulations, including:

**CLASS ACTION COMPLAINT**

a. Failing to ensure the confidentiality and integrity of electronic PHI Defendant created, received, maintained, and transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

b. Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

c. Failing to ensure compliance with the HIPAA security standard rules by its workforce in violation of 45 C.F.R. § 164.306(a)(4);

d. Failing to obtain satisfactory assurances, including in writing, that its business associates and/or subcontractors would appropriately safeguard Plaintiff's and Class Members PHI;

e. Impermissibly and improperly using and disclosing PHI for marketing in violation of 45 C.F.R. § 164.502, *et seq.*;

f. Failing to hire an expert to review the risk of data sets for re-identification and further failing to remove all digital identifiers from the data sets before disclosing the Private Information in violation of 45 C.F.R. § 160.103.

g. Failing to effectively train all members of its workforce, namely its digital marketing department and regulatory department on the policies and procedures with respect to PHI as necessary and appropriate for the members of its staff to carry out their responsibilities to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5);

**CLASS ACTION COMPLAINT**

h.  Failing to keep Private Information confidential as required by N.Y. C.P.L.R. 4504;

i.  Failing to keep Private Information confidential as required by N.Y. Pub. Health Law § 2803(3)(f);

j.  By otherwise failing to safeguard Plaintiff's and Class Members' Private Information; and

k.  By otherwise misusing and unjustly profiting from Plaintiff's and Class Member's Private Information.

256.  As a direct and proximate result of CNY's breach of fiduciary duty and confidentiality, Plaintiff and Class Members have suffered numerous harms and injuries, including invasion of privacy, loss of control of their Private Information, misappropriation of their Private Information, conversion of their Private Information, and the ongoing invasion of privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

257.  Consequently, Plaintiff individually and on behalf of the putative Class, seek the following damages: compensatory, loss of benefit of the bargain, conversion (FMV value of the use of the data for marketing), and in the alternative, nominal. Plaintiff further seeks restitution, disgorgement of profits or cost savings obtained from the improper use of the Private Information. Finally, Plaintiff seeks injunctive relief to address the ongoing breach of the fiduciary duty and financial and privacy harms derived from the continued disclosure, interception, and misuse of their Private Information.

**CLASS ACTION COMPLAINT**

**COUNT II**
**VIOLATION OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**
**18 U.S.C. § 2511(1) *et seq*.**
**UNAUTHORIZED INTERCEPTION, USE, AND DISCLOSURE**
**(On Behalf of Plaintiff and the Nationwide Class)**

258. Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

259. The ECPA protects both sending and receipt of communications.

260. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

261. The transmissions of Plaintiff's Private Information to Defendant via Defendant's Website qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

262. The transmissions of Plaintiff's Private Information to medical professionals qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(2).

263. **Electronic Communications**. The transmission of Private Information between Plaintiff and Class Members and Defendant via its Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

264. **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] *any* information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

265. **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or

**CLASS ACTION COMPLAINT**

other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

266.    **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

    a.  Plaintiff's and Class Members' browsers;

    b.  Plaintiff's and Class Members' computing devices;

    c.  Defendant's web-servers; and

    d.  The Pixel deployed by Defendant to effectuate the sending and acquisition of patient communications

267.    Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the Tracking Pixel imbedded and ran on its Website, contemporaneously and intentionally disclosed, and endeavored to disclose the contents of Plaintiff's and Class Members' electronic communications to third parties, including Facebook and Google, without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(c).

268.    Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the Tracking Pixel imbedded and ran on its Website, contemporaneously and intentionally used, and endeavored to use the contents of Plaintiff's and Class Members' electronic communications, for purposes other than providing health care services to Plaintiff and Class Members without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(d).

269. Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the source code it imbedded and ran on its web properties, contemporaneously and intentionally redirected the contents of Plaintiff's and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Facebook and Google.

270. Defendant's intercepted communications include, but are not limited to, the contents of communications to/from Plaintiff's and Class Members' regarding PII and PHI, treatment, medication, and scheduling.

271. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

272. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

273. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Pixel to track and utilize Plaintiff's and Class Members' PII and PHI for financial gain.

274. Defendant was not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communication.

**CLASS ACTION COMPLAINT**

275.    Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's privacy via the Pixel tracking code.

276.    Any purported consent that Defendant received from Plaintiff and Class Members was not valid.

277.    **Unauthorized Purpose**. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious or criminal act in violation of the Constitution or laws of the United States or of any State – namely, violations of the New York Patient's Bill of Rights, New York Public Health laws, and invasion of privacy, among others.

278.    The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

279.    Defendant is a "party to the communication" with respect to patient communications. However, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Private Information does not qualify for the party exemption.

280.    Defendant's acquisition of patient communications that were used and disclosed to the Unauthorized Third-Party Marketers was done for purposes of committing numerous criminal and tortious acts in violation of the laws of the United States and New York, including.

   a.  Criminal violation of HIPAA, 42 U.S.C. § 1320d-6;

   b.  Criminal violation of New York Computer Crime statutes, including: Unauthorized use of computer (N.Y. Penal § 156.05); Unlawful duplication (N.Y. Penal § 156.29); and Computer trespass (N.Y. Penal § 156.10);

c.  Violation of the New York Patient's Bill of Rights, N.Y. Pub. Health § 2803-c;

d.  Violation of law regarding New York Civil Practice Law and Rules § 4504;

e.  Violation of the New York Deceptive Trade Practices Act, Gen. Bus. Law § 349; and

f.  Invasion of Privacy.

281.  Frist, under 42 U.S.C. § 1320d-6, it is a criminal violation for a person to "use[] or cause[] to be used a unique health identifier" or to "disclose[] individually identifiable health information to another person … without authorization" from the patient.

282.  The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

283.  Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it:

a.  Used and caused to be used cookie identifiers associated with specific patients without patient authorization; and

b.  Disclosed individually identifiable health information to Facebook and Google without patient authorization.

284.  Defendant's conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Defendant's use of the Tracking Tool source code was for Defendant's commercial advantage to increase revenue from existing patients and gain new patients.

285.  Second, under N.Y. Penal Law § 156.05, a person commits the offense of unauthorized use of a computer if he "knowingly uses, causes to be used, or accesses a computer, computer service, or computer network without authorization."

286. Defendant violated the N.Y. Penal Law § 156.05 in that Defendant knowingly used and accessed Plaintiff's and Class Members' computing devices and data as part of a deception and without their authorization, including through placement of the fbp, ga, and gid cookies as well as use of source code that commanded Plaintiff's and Class Members' computing devices to send identifiers and the content of communications with Defendant simultaneously to Defendant and Facebook, Google, and others.

287. Third, under N.Y. Penal Law § 156.29, a person commits the offense of unlawful duplication of computer related materials if he copies, reproduces or duplicates in any manner computer material that contains records of the medical history or medical treatment of an identified or readily identifiable individual or individuals with an intent to commit or further the commission of any crime under this chapter.

288. Defendant violated N.Y. Penal Law § 156.29 by exceeding its authorization to access Plaintiff's and Class Members' computers including through placement of the fbp, ga, and gid cookies as well as use of source code that commanded Plaintiff's and Class Members' computing devices to make unauthorized copies of Plaintiff's and Class Members' electronic data and to send identifiers and the content of communications with Defendant simultaneously to Defendant and Facebook, Google, and others.

289. Fourth, under N.Y. Penal Law § 156.10, a person commits the offense of computer trespass if he knowingly uses, causes to be used, or accesses a computer, computer service, or computer network without authorization and:

    a. He or she does so with an intent to commit or attempt to commit or further the commission of any felony; or

    b. He or she thereby knowingly gains access to computer material.

**CLASS ACTION COMPLAINT**

290. Defendant violated N.Y. Penal Law § 156.10 when it knowingly and without Plaintiff or Class Members' authorization inserted the fbp, ga, and gid cookies on Plaintiff's and Class Members' computing devices.

291. The fbp, ga, and gid cookies, which constitute programs, commanded Plaintiff's and Class Members' computing devices to remove and redirect their data and the content of their communications with Defendant to Google, Facebook, and others.

292. Defendant knew or had reason to know that the fbp, ga, and gid cookies would command Plaintiff's and Class Members' computing devices to remove and redirect their data and the content of their communications with Defendant to Google, Facebook, and others.

293. Fifth, under New York's Rights of Patients in Certain Medical Facilities, N.Y. Pub. Health § 2803-c(3)(f), "[e]very patient shall have the right to have privacy in treatment and in caring for personal needs, confidentiality in the treatment of personal and medical records, and security in storing personal possessions."

294. Defendant violated the New York Rights of Patients by disclosing Plaintiff's and Class Members' Private Information to third parties without authorization or consent.

295. Finally, under New York Civil Practice Law and Rules Section 4504, "[u]nless the patient waives the privilege" medical professionals are not "allowed to disclose any information which he acquired in attending a patient in a professional capacity, and which was necessary to enable him to act in that capacity."

296. Defendant violated N.Y. C.P.L.R. 4504 by disclosing Plaintiff's and Class Members' Private Information to third parties without authorization or consent.

297. Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiff's and Class Members' communications about their

**CLASS ACTION COMPLAINT**

individually-identifiable patient health information on its Website, because it used its participation in these communications to improperly share Plaintiff's and Class Members' individually-identifiable patient health information with Facebook and Google, third-parties that did not participate in these communications, that Plaintiff and Class Members did not know were receiving their individually-identifiable patient health information, and that Plaintiff and Class Members did not consent to receive this information.

298.   Defendant accessed, obtained, and disclosed Plaintiff's and Class Members' Private Information for the purpose of committing the crimes and torts described herein because it would not have been able to obtain the information or the marketing services if it had complied with the law.

299.   As such, Defendants cannot viably claim any exception to ECPA liability.

300.   Plaintiff and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

     a.  Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their individually-identifiable patient health information (including information about their medical symptoms, conditions, and concerns, medical appointments, healthcare providers and locations, medications and treatments, and health insurance and medical bills) for commercial purposes has caused Plaintiff and the Class Members to suffer emotional distress;

     b.  Defendant received substantial financial benefits from its use of Plaintiff's and Class Members' individually-identifiable patient health information without providing any value or benefit to Plaintiff or the Class Members;

     c.  Defendant received substantial, quantifiable value from its use of Plaintiff's

and Class Members' individually-identifiable patient health information, such as understanding how people use its website and determining what ads people see on its website, building more reliable audiences, and running more efficient marketing campaigns without providing any value or benefit to Plaintiff or the Class Members;

d.  Defendant has failed to provide Plaintiff and the Class Members with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of their patient information; and

e.  Plaintiff's and Class Members' lost control and value of their PII and PHI due to Defendant utilizing their Private Information for marketing without their consent.

f.  Plaintiff and Class Members are suffering ongoing financial harm derived from the continued interception and misuse of their Private Information.

301.    Plaintiff, individually and on behalf of the putative Class,  seeks legal and equitable remedies to address and rectify the conduct described herein and are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

## COUNT III
### BREACH OF IMPLIED CONTRACT
### (on behalf of Plaintiff and the Nationwide Class)

302.    Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

**CLASS ACTION COMPLAINT**

303.    As a condition of utilizing Defendant's Website and receiving services from Defendant's healthcare facilities and professionals, Plaintiff and the Class Members provided their Private Information.

304.    When Plaintiff and Class Members provided their Private Information to Defendant, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Private Information or use it for non-medical purposes without consent.

305.    Plaintiff and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to maintain the confidentiality and limited scope of use.

306.    Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Private Information to the Un-authorized Third-Party Marketers without consent.

307.    Defendant further breach the implied contracts by using Plaintiff's and Class Members' Private Information without consent.

308.    As a direct and proximate result of Defendant's breach of these implied contracts, Plaintiff and Class Members sustained numerous injuries including but not limited to the loss of the benefit of their bargain, invasion of privacy, loss of control of their Private Information, misappropriation and misuse of their Private Information, breach of confidentiality, conversion, and the ongoing financial and privacy harms derived from the continued disclosure, interception, and misuse of their Private Information.

309.    Consequently, Plaintiff, individually and on behalf of the putative Class seeks legal and equitable remedies to address and rectify the breach of implied contract described herein including compensatory and consequential damages, loss of benefit of the bargain, conversion (FMV value of the use of the data for marketing), and in the alternative nominal damages. Plaintiff

further seeks restitution, and disgorgement of profits or cost savings obtained from breach and the improper use of the Private Information. Finally, Plaintiff seeks injunctive relief to prevent the ongoing disclosure, interception, and continued misuse of the Private Information.

## COUNT IV
## UNJUST ENRICHMENT
### (On behalf of Plaintiff and the Class)

310. Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

311. Defendant benefits from the use of Plaintiff's and Class Members' Private Information and unjustly retained those benefits at their expense.

312. Plaintiff and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiff and Class Members, without authorization and proper compensation to exceed the limited authorization and access to that information which was given to Defendant.

313. Defendant exceeded any authorization given and instead consciously disclosed, misappropriated, and misused the Private Information for marketing and its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary savings and revenue.

314. Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members for the use of the Private Information.

315. The financial benefits that Defendant derived from Plaintiff and Class Members was not offered by Plaintiff and Class Members gratuitously and rightly belong to Plaintiff and

**CLASS ACTION COMPLAINT**

Class Members. It would be against equity and good conscience for Defendant to be permitted to retain any of the savings, profit or other financial benefits wrongly derived from the misappropriation and misuse of Plaintiff's and Class Members' Private Information as alleged in this Complaint.

316. Consequently, due to the unjust nature of Defendant's actions and the injuries and damages sustained by Plaintiff and the Class, Defendant should be compelled to provide to disgorge into a common fund all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper. These equitable funds can be evenly allocated among the Plaintiff and Class Members on a pro-rata basis.

317. Alternatively, Defendant should be compelled to provide restitution to Plaintiff and Class for the fair market value of the Private Information that Defendant misappropriated and misused for marketing purposes without consent.

318. Furthermore, Plaintiff seeks injunctive relief to prevent the imminent financial and privacy harms arising from the ongoing disclosure, interception, and misuse Plaintiff's and Class Member's Private Information.

## COUNT V

### VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 631, et seq.
### (On Behalf of Plaintiff and the California Sub-Class)

319. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and bring this count individually and on behalf of the proposed California Sub-Class.

320. The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638. The Act begins with its statement of purpose.

321. The Legislature thereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private

communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

322.   California Penal Code § 631(a) provides, in pertinent part (emphasis added):

323.   Any person who, by means of any machine, instrument, or contrivance, or in any other manner … willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500).

324.   Under CIPA, CNY must show it had the consent of all parties to a communication.

325.   At all relevant times, CNY aided, employed, agreed with, and conspired with third parties, including Google, to track and intercept Plaintiff's and Class Members' internet communications.  These communications were transmitted to and intercepted by a third party during the communication without the knowledge, authorization, or consent of Plaintiff and Class Members.

326.   CNY intentionally inserted an electronic listening device onto Plaintiff's and Class Members' web browsers and devices that, without their knowledge and consent, tracked and transmitted the substance of their confidential communications to Google, and other unauthorized third parties—each of whom constitute a "person" within the meaning of the statute.

327.   CNY willingly facilitated the interception and collection of Plaintiff's and Class Members' Private Information by embedding Tracking Tools on the Website

**CLASS ACTION COMPLAINT**

328.    Moreover, Google Tag Manager, Google Analytics, and Tracking Tools are: (1) completely invisible to website and app users; and (2) CNY has full control over these tools, including where they are embedded, what information is tracked and transmitted, and how events are categorized prior to their transmission.

329.    CNY's Tracking Tools constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, they fall under the broad catch-all category of "any other manner."

330.    CNY failed to disclose its use of the Tracking Tools to specifically track and automatically and simultaneously transmit Plaintiff's and Class Members' communications to Google, and other undisclosed third parties.

331.    A portion of the Tracking Tools—such as the Google Analytics, and Google Tag Manager—are designed to transmit a website user's actions and communications contemporaneously as the user initiates each communication. As a result, the user's communications are intercepted in transit to the intended recipient—CNY—before reaching CNY's server.[47]

332.    CNY violated CIPA by aiding and permitting third parties to intercept and receive its patients' online communications in real time as they were made. Importantly, Google, and other unauthorized third parties would not have intercepted or received the contents of these communications but for CNY's actions, including its decision to install the Tracking Tools on its Website.

333.    By disclosing Plaintiff's and Class Members' Private Information, CNY violated Plaintiff's and Class Members statutorily protected right to privacy.

---

[47] CNY's use of server-side Tracking Tools resulted in the divulgence, as opposed to the interception, of Plaintiff's communications.

**CLASS ACTION COMPLAINT**

334.    As a result of the above violations, and pursuant to § 637.2, CNY is liable to Plaintiff and Class Members for treble actual damages related to their loss of privacy in an amount to be determined at trial or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the Plaintiffs have suffered, or be threatened with, actual damages."

335.    Under the statute, CNY is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

**COUNT VI**
**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 638.51(a)**
**(On behalf of Plaintiff and the California Class)**

336.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class.

337.    CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

338.    A "pen register" is a "device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of the communication." Cal. Penal Code § 638.50(b).

339.    The Tracking Tools are "pen registers" because they are device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information" from Plaintiff and Class Members' electronic communications. Id.

340.    At all relevant times, CNY installed the Tracking Tools—which are pen registers—onto Plaintiff's and Class Members' browsers, and it used the Tracking Tools to collect Plaintiff's and Class Members' Private Information.

341.    Plaintiff and Class Members did not provide their consent to CNY's installation or use of the Tracking Tools.

342.    CNY did not obtain a court order to install or use the Tracking Tools.

343.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by CNY's violations of CIPA § 638.51(a), and each seek statutory damages of $5,000 for each of CNY's violations of CIPA § 638.51(a).

<u>COUNT VII</u>
**VIOLATION OF THE CALIFORNIA
CONFIDENTIALITY OF MEDICAL INFORMATION ACT
Cal. Civ. Code § 56, et seq.
(On Behalf of Plaintiff and the California Class)**

344.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class.

345.    The California Confidentiality of Medical Information Act, Cal. Civ. Code § 56, et seq ("CMIA") prohibits health care providers from disclosing medical information relating to their patients without a patient's express authorization. Medical information refers to "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care… regarding a patient's medical history, mental or physical condition, or treatment." 'Individually Identifiable' means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual . . . ." Cal. Civ. Code § 56.05.

346.    Defendant is a healthcare provider as defined by Cal. Civ. Code § 56.06.

347.    Plaintiff and Class Members are patients of CNY and, as health care providers, CNY has an ongoing obligation to comply with the CMIA's requirements with respect to Plaintiff's and Class Members' confidential medical information.

348.    As set forth above, names, addresses, telephone numbers, email addresses, device identifiers, web URLs, IP addresses, and other characteristics that can uniquely identify Plaintiff

and Class Members are transmitted to Google in combination with insurance information, medical conditions, medical concerns, treatment(s) sought by the patients, and other patient searches and queries. This PHI and PII constitutes confidential information under the CMIA.

349.   The CID is also an identifier that allows identification of a particular individual. Along with patients' confidential Private Information, CNY disclosed its patients' CIDs.

350.   Pursuant to the CMIA, the information communicated to CNY and disclosed to Google, and other third parties constitutes medical information because it is patient information derived from a health care provider regarding a patient's medical treatment and physical condition and is received in combination with individually identifying information. Cal. Civ. Code § 56.05(i).

351.   Similarly, Google also views, processes, and analyzes the confidential medical information it receives via Google Analytics. Google then uses the viewed confidential information for advertising and marketing purposes.

352.   Defendant failed to obtain Plaintiff's and Class Members' authorization for the disclosure of medical information.

353.   Pursuant to CMIA § 56.11, a valid authorization for disclosure of medical information must: (1) be "clearly separate from any other language present on the same page and … executed by a signature which serves no other purpose than to execute the authorization;" (2) be signed and dated by the patient or their representative; (3) state the name and function of the third party that receives the information; and (4) state a specific date after which the authorization expires. The information set forth on CNY's Website, including the website's Privacy Policy and Notice of

354.   Notices of Privacy Practice do not qualify as a valid disclosure or authorization.

355.   Defendant violated the CMIA by disclosing its patients' medical information to Google along with the patients' individually identifying information.

**CLASS ACTION COMPLAINT**

356. Plaintiff and Class Members seek nominal damages, compensatory damages, punitive damages, attorneys' fees, and costs of litigation for Defendants' violations of the CMIA.

**COUNT VIII**
**VIOLATION OF UNFAIR COMPETITION LAW**
**(Cal. Bus. & Prof. Code § 17200, et seq.)**
**(On Behalf of Plaintiff and the California Sub-Class)**

357. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Sub-Class.

358. California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

359. CNY engaged in unlawful business practices in connection with its disclosure of Plaintiff's and Class Members' Private Information to unauthorized third parties, including Google in violation of the UCL.

360. CNY's acts, omissions, and conduct, as alleged herein, constitute "business practices" within the meaning of the UCL.

361. CNY violated the "unlawful" prong of the UCL by violating, inter alia, Plaintiff's and Class Members' constitutional rights to privacy, state and federal privacy statutes, and state consumer protection statutes.

362. CNY's acts, omissions, and conduct also violate the unfair prong of the UCL because those acts, omissions, and conduct offend public policy (including the federal and state privacy statutes and state consumer protection statutes, such as the ECPA, CIPA, CMIA, and HIPAA) and constitute immoral, unethical, oppressive, and unscrupulous activities that caused substantial injury, including to Plaintiff and Class Members.

**CLASS ACTION COMPLAINT**

363.    The harm caused by CNY's conduct outweighs any potential benefits attributable to such conduct, and there were reasonably available alternatives to further CNY's legitimate business interests other than CNY's conduct described herein.

364.    Plaintiff and Class Members suffered from a loss of the benefit of their bargain with CNY because they overpaid for insurance services they believed included data security sufficient to maintain their Private Information as confidential.

365.    As a result of CNY's violations of the UCL, Plaintiff and Class Members are entitled to injunctive relief. This is particularly true since the dissemination of Plaintiff's and Class Members' information is ongoing.

366.    As result of CNY's violations of the UCL, Plaintiff and Class Members have suffered injury in fact and lost money or property, including but not limited to payments to CNY for services and/or other valuable consideration, e.g., access to their private and personal data.

367.    Plaintiff and Class Members would not have used CNY's services, or would have paid less for them, had they known CNY was breaching confidentiality and disclosing their Private Information to social media and tech giants, such as Google.

368.    The unauthorized access to Plaintiff's and Class Members' Private Information has also diminished the value of that information.

369.    In the alternative to those claims seeking remedies at law, Plaintiff and Class Members allege that there is no plain, adequate, and complete remedy that exists at law to address CNY's unlawful and unfair business practices.

370.    Further, no private legal remedy exists under HIPAA. Therefore, Plaintiff and Class Members are entitled to equitable relief to restore Plaintiff and Class Members to the position they would have been in had CNY not engaged in unfair competition, including an order enjoining CNY's wrongful conduct, restitution, and disgorgement of all profits paid to CNY as a result of its unlawful and unfair practices.

## COUNT IX
### INVASION OF PRIVACY UNDER CALIFORNIA CONSTITUTION
### (On Behalf of Plaintiff and the California Sub-Class)

371.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class.

372.    Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their Private Information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites for the provision of insurance and health care without being subjected to wiretaps, pin registers, and/or trap and trace devices without their knowledge or consent.

373.    By using Google's Tracking Tools to communicate patients' CIDs and other individually identifying information alongside their confidential medical communications and insurance information, CNY intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution.

374.    Plaintiff and Class Members had a reasonable expectation that their communications, identity, health information and other data would remain confidential, and that CNY would not install wiretaps, pin registers, and/or trap and trace devices to secretly transmit their communications and routing information.

375.    Plaintiff and Class Members did not authorize CNY to transmit their Private Information to third parties, nor did they consent to allowing third parties to intercept, receive, and view those communications.

376.    This invasion of privacy is serious in nature, scope, and impact because it relates to patients' private medical communications. Moreover, it constitutes an egregious breach of the societal norms underlying the privacy right.

377. As a result of CNY's actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

378. Plaintiff and Class Members have been damaged as a direct and proximate result of CNY's invasion of their privacy and are entitled to just compensation, including monetary damages.

379. Plaintiff and Class Members seek appropriate relief for this injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests.

380. Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of CNY's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights.

381. Such damages are needed to deter CNY from engaging in such conduct in the future.

382. Plaintiff also seeks such other relief as the Court may deem just and proper.

**COUNT X**
**NEGLIGENCE**
**(Alternative Count)**
**(On behalf of Plaintiff and the Class)**

383. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class.

384. In the alternative, Plaintiff brings an action for negligence.

385. Defendant owed Plaintiff and Class Members a duty to keep their Private Information completely confidential, and to safeguard sensitive personal and medical information.

386. Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant installed Tracking Technologies disclose and transmit to third parties Plaintiff's and Class Members' communications with Defendant, including Private Information and the contents of such information.

**CLASS ACTION COMPLAINT**

387. These disclosures were made without Plaintiff's or Class Members' knowledge, consent, or authorization, and were unprivileged.

388. While Defendant intentionally implemented the Tracking Tools, Defendant was unaware of that the Tracking Tools were capable to collecting personally identifiable information that constituted personal health information.

389. It was highly foreseeable that the worlds most sophisticated digital marketing companies at issue here would be able to connect the website data related to past, present, and future medical care with specific individuals.

390. Defendant was negligent in one or more of the following ways:

   a. Failed to hire outside experts to review the marketing plan to ensure all identifiers were removed;

   b. Failed to remove all identifiers as advised by HIPAA regulations;

   c. Failed to test its marketing systems for level of entropy that could be used to identify individuals;

   d. Failed to adequately train its digital marketing team on data privacy standards and policies;

   e. Failed to recognize the connection between its targeted marketing campaigns an ecosystem capable of identifying individuals who visited the Website;

   f. Was otherwise negligent.

391. As a direct and proximate result of Defendant's breach, Plaintiff and Class Members sustained numerous injuries including but not limited to the, invasion of privacy, loss of control of their Private Information, misappropriation and misuse of their Private Information, breach of confidentiality, conversion, and the ongoing financial and privacy harms derived from the continued disclosure, interception, and misuse of their Private Information.

**CLASS ACTION COMPLAINT**

392.   Consequently, Plaintiff, individually and on behalf of the putative Class seeks legal and equitable remedies to address and rectify the breach of implied contract described herein including compensatory and consequential damages, loss of benefit of the bargain, conversion (FMV value of the use of the data for marketing), and in the alternative nominal damages. Plaintiff further seeks restitution, and disgorgement of profits or cost savings obtained from breach and the improper use of the Private Information. Finally, Plaintiff seeks injunctive relief to prevent the ongoing disclosure, interception, and continued misuse of the Private Information.

## COUNT XI
### VIOLATIONS OF THE NEW YORK CONSUMER LAW FOR DECEPTIVE ACTS AND PRACTICES GEN. BUS. LAW § 349
### (On behalf of Plaintiff and the Class)

393.   Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class.

394.   This cause of action is brought pursuant to the New York General Business Law § 349 ("NYGBL"), which New York courts have invariably interpreted using the kind of liberal construction afforded to state consumer protection statutes intended to prevent fraud.

395.   NYGBL § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in the state of New York.

396.   By reason of the conduct alleged herein, Defendant engaged in unlawful practices within the meaning of NYGBL § 349. The conduct alleged herein is a "business practice" within the meaning of NYGBL § 349, and the deception occurred within New York State.

397.   By serving as Plaintiff's and Class Members' healthcare provider, Defendant had a duty to protect their Private Information from unlawful disclosure.

398.   Plaintiff and the Class Members paid for or otherwise availed themselves and received services from Defendant, for the purpose of medical treatment.

399.    Defendant engaged in the conduct alleged in this Class Action Complaint, entering into transactions intended to result, and which did result, in the provision of medical treatment to Plaintiff and Class Members.

400.    Defendant's acts, practices, and omissions were done in the course of Defendant's offer of medical treatment, services, and care throughout the state of New York.

401.    The unfair, unconscionable, and unlawful acts and practices of Defendant alleged herein, and in particular the decisions regarding the Tracking Tools emanated and arose within the state of New York, within the scope of NYGBL § 349.

402.    Defendant, operating in and out of New York, engaged in unfair, unconscionable, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of NYGBL § 349, including but not limited to the following: (a) knowingly promising to protect Plaintiff's and Class Members' Private Information, (b) knowingly and improperly storing, possessing, using, and/or procuring the interception of, Plaintiff's and Class Members' Private Information; and (c) knowingly disclosing Plaintiff's and Class Members' Private Information to third parties, including Facebook.

403.    Defendant committed these acts while concurrently representing that it would protect and not unlawfully disclose Plaintiff's and Class Members' Private Information unless under a legal obligation to do so.

404.    These unfair, unconscionable, and unlawful acts and practices violated duties imposed by laws, including by not limited to HIPAA, the New York Patient's Bill of Rights, New York computer crime statutes, statutes regarding the confidentiality of medical records, and NYGBL § 349.

405.    Defendant knew or should have known that its Website and the cookies and source code thereon was unlawfully wiretapping, intercepting, and disclosing Plaintiff's and Class Members' Private Information.

406.    Plaintiff has standing to pursue this claim because as a direct and proximate result of Defendant's violations of NYGBL § 349, Plaintiff and Class Members have been "aggrieved" by a violation of NYGBL § 349 and bring this action to obtain a declaratory judgment that Defendant's acts or practices violate NYGBL § 349.

407.    Plaintiff also has standing to pursue this claim because, as a direct result of Defendant's knowing violation of NYGBL § 349, Plaintiff and Class Members have lost money or property in the form monies paid for Defendant's services, diminution in value of their Private Information, as well as loss of the benefit of their bargain with Defendant.

408.    Plaintiff and Class Members are entitled to injunctive relief to protect them from the substantial and imminent risk of future loss of Private Information, including, but not limited to: (a) ordering that Defendant immediately remove any pixel, web beacon, cookie, or other tracking technology that causes the disclosure of Private Information to third parties without consent; (b) ordering that Defendant engage third-party security auditors and internal personnel to ensure Plaintiff's and Class Members' Private Information is no longer subject to the unlawful practices described in this Complaint; (c) ordering that Defendant purge, delete, and destroy Private Information not necessary for its provisions of services in a reasonably secure manner; (d) ordering that Defendant conduct regular database scans and security checks; (e) ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to properly handle Private Information provided via Defendant's Website; (f) ordering Defendant to meaningfully educate individuals about the threats they face as a result

**CLASS ACTION COMPLAINT**

of the loss of their Private Information to third parties, as well as the steps victims should take to protect themselves.

409.    Plaintiff brings this action on behalf of herself and Class Members for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiff, Class Members, and the public from Defendant's unfair methods of competition and unfair, unconscionable, and unlawful practices. Defendant's wrongful conduct as alleged in this Class Action Complaint has had widespread impact on the public at large.

410.    The above unfair, unconscionable, and unlawful practices and acts by Defendant were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and Class Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

411.    Defendant's actions and inactions in engaging in the unfair, unconscionable, and unlawful practices described herein were negligent, knowing and willful, and/or wanton and reckless.

412.    Plaintiff and Class Members seek relief under NYGBL § 349, including, but not limited to, a declaratory judgment that Defendant's actions and/or practices violate NYGBL § 349; injunctive relief enjoining Defendant, their employees, parents, subsidiaries, affiliates, executives, and agents from continuing to violate NYGBL § 349 as described above.

413.    Plaintiff and Class Members are also entitled to recover actual damages, to recover the costs of this action (including reasonable attorneys' fees), and such other relief as the Court deems just and proper.

**CLASS ACTION COMPLAINT**

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendant and that the Court grant the following:

A.      For an Order certifying the Class and appointing Plaintiff and Counsel to represent such Class;

B.      For an award of damages, including, but not limited to, past and future compensatory, actual, consequential, statutory, and nominal damages, as allowed by law in an amount to be determined;

C.      For equitable relief in the form of restitution and disgorgement of profits;

D.      For injunctive relief requested by Plaintiff, including, but not limited to:

    i.    Removal of the Tracking Tools from sensitive parts of the Website;

    ii.   Deletion of all analytics data collected through the Tracking Tools;

    iii.  Deletion of all audience profiles and campaigns built data gathered from the Tracking Tools;

    iv.   Deletion of Plaintiff's and Class Member data from all identifiable third party broker lists;

    v.    Enjoinment from utilizing any of the Tracking Tools at issue in this matter in the future.

    vi.   Enjoinment from utilizing any other tracking technology or marketing services without first obtaining HIPAA compliance patient consent and BAA agreements with the third parties.

    vii.  Other injunctive relief as ordered by the Court.

E.      For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.      For prejudgment interest on all amounts awarded; and

**CLASS ACTION COMPLAINT**

G.       Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demand that this matter be tried before a jury.

DATE: February 27, 2026                        Respectfully Submitted,

*/s/ Mitchell Breit*
Mitchell Breit
**MILBERG, PLLC**
405 E. 50th Street
New York, NY 10022
Telephone: (202) 932-7081
mbreit@milberg.com

Michael Acciavatti *
**MILBERG PLLC**
405 East 50th Street
New York, NY 10022
Tel: (212) 594-5300
macciavatti@milberg.com

Alexandr Rudenco*
**MILBERG PLLC**
800 S. Gay Street, Suite 100
Knoxville, TN 37929
Tel: (865) 263-8384
arudenco@milberg.com

 Joseph M. Lyon*
Kevin Cox*
**THE LYON FIRM, ALC**
2754 Erie Ave.
Cincinnati, Ohio 45208
Phone: (513) 381-2333
Fax: (513) 766-9011
*jlyon@thelyonfirm.com*
cwatspm@thelyonfirm.com

***Counsel for Plaintiff and the Putative Class***

* *pro hac vice* forthcoming

**CLASS ACTION COMPLAINT**